INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., and Angus Murphy, etc., Plaintiffs,

v.

NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, The New York Football Giants, Inc., and Cosmos Soccer Club, Inc., Defendants.

Civ. No. 78–734.

United States District Court, D. New Jersey.

Sept. 22, 1981.

Bergen County Chapter, American Civil Liberties Union by Anne M. Nelson, Trenton, N. J., for plaintiffs; and Anderson & Rubin by Leonard H. Rubin, New York City, of counsel.

Zazzali, Zazzali & Whipple by James R. Zazzali, Newark, N. J., for defendants Authority.

Alfred W. Roberts by John F. Marshall, Jersey City, N. J., for defendant Giants; Kelley, Drye & Warren by Richard J. Concannon, and Paul F. Doyle, New York City, of counsel.

Fischer, Kagan, Klein, Giampara & Miller by Jay D. Fischer, Clifton, N. J., for defendant Cosmos; Paul, Weiss, Rifkind, Wharton & Garrison by Max Gitter, and Sidney H. Stein, New York City, of counsel.

## OPINION

BIUNNO, District Judge.

The question presented in this case is whether the New Jersey Sports and Exhibition Authority (Authority) may have and enforce a policy forbidding the solicitation

of money and the distribution of literature and other goods in exchange for a solicited donation, at the Meadowlands Sports Complex (Sports Complex) without thereby contravening the First Amendment as applied to the States through the Fourteenth Amendment. The suit is grounded on 42 U.S.C. § 1983.

There is no issue of denial of access, as there was in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which was an equal protection case involving the right of the Eagle Coffee Shoppe, Inc., a lessee of a Delaware public agency, to exclude Mr. Burton as a patron, and to refuse to serve him as it served others, solely on the ground that he was a Negro.

At the time of *Burton*, of course, the Civil Rights Act of 1964 had not yet been enacted, and the constitutional issue in *Burton* could not arise today. See 42 U.S.C. § 2000a, which guarantees equal access to any "place of public accommodation" without regard to race, color, religion or national origin [par. (a) ], and which defines such a "place" as including "any restaurant . . . principally engaged in selling food for consumption on the premises" [par. (b)(2) ], as well as any "sports arena, stadium or other place of exhibition or entertainment" [par. (b)(3) ].

The same concept is embodied even more broadly in New Jersey's Law Against Discrimination, which forbids discrimination because of "race, creed, color, national origin, ancestry, age, sex, marital status or liability for service in the Armed Forces", NJSA 10:5–3, or because of the "physical handicap of such person", NJSA 10:5–4.1. For the definition of a "place of public accommodation", see NJSA 10:5–5(*l*), and for the specific prohibition of denial of access for that category, see NJSA 10:5–12(f).

Although there is an entrance fee (by way of a parking charge) to enter the Sports Complex at all, and an admission fee (by way of ticket) to enter the racetrack or stadium, all who pay may enter without restriction based on any ground forbidden by either the federal or state statute. Nor

do plaintiffs claim any right to enter without payment of the parking and admission fees charged to all patrons.

Nor is there any issue of equal protection raised against the policy forbidding solicitation and distribution. There is no suggestion that the policy allows some patrons to solicit or distribute and others not, or that there is any discretion to do so. The policy is uniform and applies to all patrons. Of course, there is distribution and sale of literature and merchandise by the concessionaires of the Authority, and by its tenants and licensees, such as the Giants football team and the Cosmos soccer club, but these are items directly connected with the specific activities carried on, such as programs and related souvenirs, or necessary incidentals such as food and beverages. All of these are an inherent part of the conduct of the Sports Complex and to not only accommodate patrons but also to support the revenues.

Also, there is no issue in this case involving denial of pure speech. Nothing in the policy forbids conversations between patrons on any subjects of interest to them. Reasonably construed, the policy is aimed at the organized solicitation of funds, by whatever means, to support a purpose unrelated to the activities for which the Sports Complex is operated, no matter how worthy or appealing such other purposes may be. The evidence showed without contradiction and without exception that all requests for permission to solicit have been uniformly declined.

Finally, there is no issue in this case of allowing solicitation and sales by outside groups from booths, in contrast to peripatetic solicitation and sales away from booths, as has been involved in some State Fair cases. There are no solicitation booths for use by outsiders, whether civic, charitable, religious or commercial. The only booths, and they are few in number, are portable (usually wheeled) ones for the concessionaires selling food, beverages, souvenirs, programs, and newspapers known for publishing daily racing information. From the court's viewing, of the racetrack on one

occasion and of the stadium on another, it is obvious that both structures were designed and built to Spartan standards, without the provision of space for booths in sufficient number to accommodate the wide array of solicitors who would be entitled to a fair and reasonable opportunity to be assigned a booth if that system were adopted. Nor do the pleadings or the evidence even remotely suggest that the Authority is under any obligation to provide booths, or that plaintiffs have any desire to make use of a booth. The claim is one for peripatetic or ambulatory solicitation and distribution coupled with requests for donations.

I. *The Sports Complex.*

The Authority was created by N.J.P.L. 1971, c.137, NJSA 5:10–1, et seq. The title of the Act is:

"An Act to provide stadiums and other buildings and facilities in the Hackensack meadowlands for athletic contests, horse racing and other spectator sporting events and for trade shows and other expositions; creating the New Jersey Sports and Exhibition Authority and defining its powers and duties; authorizing the issuance of bonds and notes of the authority, providing for the terms and security thereof; and providing an appropriation therefor."

■ The general history preceding this enactment is well-known throughout the State and may be judicially noticed. Much of the history is reviewed in the litigation challenging the validity of the Act under the N.J. Constitution. See *N.J. Sports and Exposition Authority v. McCrane*, 119 N.J. Super. 457, 292 A.2d 580 (1971), modified and affirmed 61 N.J. 1, 292 A.2d 545 (1972), appeal dismissed 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215.

Very briefly, the impetus arose from the long dissatisfaction felt in New Jersey with its perceived inferior position between the major cities of New York and Philadelphia, as well as vis-a-vis other States, in respect to professional athletic facilities.

In the old days, before TV cut into stadium attendance, New Jersey had at least two important baseball farm teams, the Newark Bears (a farm team for the Yankees) and the Jersey City Giants (a farm team for the Giants). These have long vanished. When professional football made its bow, there were some minor league games at the Newark School Stadium, but not much else, and even that vanished when professional football built a following on TV broadcasting, culminating with the Superbowl game.

The economics of professional sports also changed drastically with time. Major revenues came to be derived from TV broadcasting rather than from paid attendance, and with the enlargement of leagues and transfer of teams to various parts of the country, New Jersey saw itself slighted.

During the administration of Governor Cahill, the idea was conceived of trying to attract a major league professional team to a New Jersey home location. The only interest developed was with the New York Football Giants who, for a while, were without a stadium and played their home games at the Yale Bowl in Connecticut.

There was never any question about where a stadium should be located, if one were to be built, and that location was in the Hackensack meadowlands, some 20,000 acres of semi-swampland and the largest undeveloped area of real estate near New York City.

Development of the Meadowlands had been a much discussed and studied dream for a very long time. In 1968, the Meadowlands Development Commission was created, P.L. 1968, c. 404, NJSA 13:17–1, et seq. to try to organize a specific plan or program to put this area to use. Aside from its proximity to New York City, the area is threaded with major highways and is accessible via Route 3 to mid-town New York, via Route 80 and the N.J. Turnpike to the George Washington Bridge, and via the Garden State Parkway and Route 3 to the N.Y. Thruway. The northern segment of New Jersey is heavily populated as well, and adds to the New York potential "market".

It was soon found, however, that no professional team had the financial ability to undertake the capital expense of land acquisition, site preparation and construction of a major league stadium and supporting facilities. Direct State funding was ruled out because of the need for a statewide referendum under *N.J.Const.*, 1947, Art. 8, sec. 2, par. 3. An autonomous public instrumentality issuing revenue bonds was out of the question because the revenues from a stadium could not possibly meet bond service requirements and it would be impossible to sell the bonds.

Whoever the author was, someone came up with the idea that if a pari-mutuel race track were built along with the stadium, its revenues could carry the combined project. This is what was done. The policy declaration in NJSA 5:10–2 emphasizes the public need for inducing professional athletic teams (particularly major league football and baseball) to locate their franchises in New Jersey, and the need to provide stadiums in addition to horse racing. The powers in NJSA 5:10–5 mention the holding of horse race meetings and the operation of a pari-mutuel system of wagering, but do not mention a "stadium". This is mentioned in NJSA 5:10–6.

Even after the act was passed and its validity under local law established, however, the project was not activated at once, no doubt due to the financial uncertainties of the 1973 OPEC oil embargo and the ensuing quadrupling of oil prices.

In any event, in the transition period between the Cahill and Byrne administrations, the latter decided to have the project go forward. See Exh C–3, the financial "prospectus" for the 1974 revenue bonds dated January 15, 1974. The insert between pp. 8–9 of that exhibit shows the master site plan, which has been executed substantially as shown.

The estimates at that time foresaw $58.8 million for land acquisition, $46.7 million for site preparation and parking areas, $42.8 million for the race track, and $48.8 million for the stadium. See Exh C–3, p.12. Net operating revenue for 1977 were estimated at $28.7 million from the racetrack, Exh. P–3, p.18, but no estimate was made of net revenues from the stadium.

The "prospectus" for the 1978 refunding bonds, Exh. C–4, carries actual figures for 1977. At p. 15, it shows $49.4 million of racing revenue before administrative expenses, and $1.2 million of stadium revenue before those expenses, which aggregated $3.3 million. See, also, p. B–6 of Exh. C–4.

So far as land, site preparation and construction costs are concerned, Exh. C–4 shows at p. B–18 that land cost at the end of 1977 was $57.7 million, site preparation was $55.5 million, construction of the race track was $60.6 million, and of the stadium $75.9 million. Taking just the stadium construction cost of $75.9 million, the net revenue of $1.2 million before administrative expense works out to less than 2%, or not even enough to pay the stadium's share of bond interest (7.5% on the 1974 term bonds and 6.25% on the 1978 term bonds). That the race track revenue substantially carries the entire project is beyond dispute.

From the standpoint of the N.J. constitution, the authorization to conduct pari-mutuel wagering at the race track derives from an amendment to Art. 4, sec. 7, par. 2 of the 1844 Constitution, adopted at a special election June 20, 1939 and proclaimed July 11, 1939.

That amendment authorized pari-mutuel betting at duly legalized race tracks, thereby modifying the original 1844 Constitution which barred the legalization of any lottery, and the 1897 amendment which barred the legalization of any "pool-selling, book-making or gambling of any kind." When the 1947 Constitution was adopted, the 1939 authorization for pari-mutuel betting at legalized race tracks was continued in force by reference: Art 4, sec. 7, par. 2 begins with the general prohibition:

"No gambling of any kind shall be authorized by the Legislature"

It then excepts:

"unless the specific kind, restrictions and control thereof *have been heretofore submitted* to, and authorized by a majority

of the votes cast by, the people *at a special election...*"

The 1939 special election for pari-mutuel betting at horse race tracks was the only one within this language.

One of the difficult problems with the Authority's enabling legislation was one of the controls specified by the 1939 amendment, which allowed:

"pari-mutuel betting on the results of the racing of horses only, *from which the State shall derive a reasonable revenue for the support of government...*" (emphasis added)

Detailed analysis of this provision is found in the several opinions in 61 N.J. 1, 292 A.2d 545 (1972).

After the 1939 constitutional amendment authorizing pari-mutuel betting at legalized race tracks, there were four separate tracks licensed by the State Racing Commission. These were the Garden State Race Track (outside of Camden), the Monmouth Park Race Track (west of Long Branch), Atlantic City Race Track (near Atlantic City) and Freehold Race Track (off Route 9, Freehold). All four were privately owned and operated, with the State receiving a share of the gross bets. The first three were "flat" or thoroughbred tracks, while Freehold was a harness racing track. Thus, the race track at the Sports Complex is the only New Jersey track owned and operated by an instrumentality of the State, i.e., the Authority.

To satisfy the 1939 constitutional amendment that the legalized pari-mutuel betting provide a reasonable revenue for the support of government, the enabling legislation requires that ½ of 1% of the gross amounts bet be deposited annually in the General State Fund "as an initial payment to the State", NJSA 5:10–7(f). In addition, after making all payments and setting aside all reserves called for by the bond resolution, and payments to local municipalities in lieu of taxes under NJSA 5:10–18, subd. b and c, the remaining balance is to be deposited in the General State Fund, NJSA 5:10–6, subd. b(6), with 40% thereof to be appropriated to the Meadowlands Commission. By amendment of 1978 in connection with refunding bonds issued by the State pursuant to referendum, the 40% share for the Meadowlands Commission is to be appropriated from the balance of the amount so paid after deducting debt service savings realized from the refinancing so achieved.

Also, in 1978, after a fire that destroyed the structures at the Garden State Race Track, a supplemental law was passed to enable the Authority to acquire the land, reconstruct and operate the track, but only upon presentation of a feasibility study demonstrating that the project would generate revenues sufficient to insure repayment of indebtedness incurred, and that the operation will not have a materially adverse effect on the operations and financial condition of the Sports Complex. Legislative approval is also required before undertaking the project. See NJPL 1978, c. 1, NJSA 5:10–27 (pocket part). The Garden State project has not been undertaken.

At the time of trial, the Sports Complex consisted only of the two facilities: the race track and Giants stadium. The racetrack had been enlarged by adding a fourth floor to house an enclosed restaurant seating 1,000 patrons and equipped with some 70 pari-mutuel windows (Exh. C–4, p. 14). Another project, in the early stages of construction at the time, was a 20,000 seat arena on a previously undeveloped 67 acres at the east end of the Sports Complex site. Aside from indoor sports activities (i.e., basketball, hockey, etc.), the facility was planned with 40,000 sq. ft. of potential exhibit space which, if used with the arena floor, can support industrial and leisure-type exhibits and shows. Parking would be provided for 4,000 cars with overflow using the 20,000 car area in existence for the race track and stadium. See Exh. C–4, p. 13. Since trial, the arena has been completed and was opened in August, 1981.

No part of the present suit, and none of the evidence of record, deals with this third structure. This opinion contains no ruling in connection with the arena structure.

## II. *The "State Action" Issue*

In order to support a claim under 42 U.S.C. § 1983, the deprivation of asserted rights under the Constitution or laws of the United States must be "under color of state law".

The defendants have taken the position that the race track and stadium are operated precisely in the same fashion as private facilities are.

Reliance is placed on testimony, such as that of the witness Harter, to the effect that:

1. The Authority project was financed with funds from the private sector through the issuance of bonds (the capital structure is 100% debt and zero equity), and not with tax funds.

2. The Authority is a supplier of funds rather than a user of funds. It is to be a profitmaker. It generates revenues in the same way as private enterprises. It relies on ticket sales, institutional advertising, and the efforts of its lessee and licensee, the Giants and the Cosmos.

3. The employees at the managerial level are drawn from private enterprise and with experience in the subject field.

4. All employees, whether managerial or rank and file, are not in the civil service, and such labor unions as are recognized are private sector unions.

5. The Authority has its own private plan for medical and life insurance benefits, entirely separate and apart from any plan applicable to State employees.

6. The Authority depends on being able to meet competition from private industry such as Madison Square Garden, Roosevelt Raceway, Monmouth Park, Yonkers Raceway, and others.

7. It deals on a day-to-day basis with business people as customers, such as the Giants and the Cosmos. Even colleges and high schools utilizing the facilities are dealt with as business customers.

8. A large group in private business with which it deals are in the race track: owners, trainers, horsemen, suppliers, vendors, grooms, jockeys and drivers are all in private business and deal with the Authority as independent contractors.

9. It depends a good deal on advertising. There is no captive market. The Authority is not like a sewerage or water authority where there is but one place to go.

10. It uses outside consultants in the fashion of a private corporation, including outside general counsel, advertising and public relations consultants, TV consultants, and a variety of others.

In sum, the argument is that the Authority is engaged in business activities of a private sector nature—what is generally regarded as a proprietary function rather than a governmental function, such as providing roads and streets, or water or sewerage or general police and fire protection and the like. The distinction has long been recognized for one purpose or another.

That the facts testified to are true the court has no doubt, and it is a fact that the betting operation (on which the financial success of the effort mainly depends) is required to provide reasonable revenues for the support of government, just as privately owned and operated New Jersey race tracks must do.

These facts, though they may be relevant to other issues, however, are not controlling as the court sees it on the question of State action. See, e.g., *Marsh v. Alabama*, 326 U.S. 501, 502, 66 S.Ct. 276, 277, 90 L.Ed. 265 (1946), involving a "company town" privately owned.

The Authority's "certificate of incorporation" establishes it as "a public body corporate and politic . . . as an instrumentality of the State exercising public and essential governmental functions . . .", NJSA 5:10–4, subd. a. Also, *N.J.Const.1947*, Art. 5, sec. 4, par. 1 requires that "All executive and administrative offices, departments, *and instrumentalities of the State government* . . . shall be allocated by law among and within not more than twenty principal departments. . ." By NJSA 5:10–4, subd. a, the Authority is established "in the Department of Community Affairs", in compliance

with the constitutional mandate. Action taken by the members of the Authority (equivalent to its directors or trustees) is subject to veto by the Governor within 15 days after delivery of the minutes of each meeting to him, NJSA 5:10–4, subd. i.

█ The challenged policy is reflected in minutes of meetings of July 14, 1977 (Exh. P–102) and October 13, 1977 (Exh. P–101). There was no evidence that the minutes were delivered to the Governor, but if they were not, then under the veto provision they never took effect. Since that section requires that a true copy of the minutes of every meeting be delivered "forthwith" to the Governor, the presumption is that the law was obeyed. And, since there is nothing to show that the Governor disapproved them within 15 days, they took effect with his implied consent.

Beyond that, in the litigation challenging the constitutionality of the enabling act, it could not have withstood the challenge without the determination by the Supreme Court of New Jersey that the statute was for public purposes and that the Authority was a public entity and an instrumentality of the State. This it found, 61 N.J. 1, 292 A.2d 545 (1972).

█ In these circumstances, the court sees no legal basis for determining that the challenged policy is not under color of state law, and concludes that State action exists.

Of course, a finding of State action is only the beginning of the inquiry. Without it, the inquiry would end. But the existence of State action does not at all imply that the action taken is invalid. The policy of the Authority is confined to its restricted domain at the Sports Complex, covering at most 750 acres of meadowlands, see NJSA 5:10–22. A site of 750 acres is hardly the entire State of New Jersey or, for that matter, is it more than a speck of the State's total area of 8,204.87 sq. miles.

### III. *The Religion and the bona-fides of plaintiffs.*

There was considerable testimony, and massive amounts of documentary exhibits about the claimed religion. A summary of what was shown is set out in Appendix A to this opinion.

It is enough here to say that the claimed religion is a Western World variation of an offshoot or sect of the ancient Hindu religion, attributed to Lord Caitanya in the late 1400's or early 1500's. His teachings are said to have been brought to Canada in 1896, and to New York in about 1965.

There seems not to be any specific name for the Western variation. It is described as the Hare Krishna movement, or Krishna consciousness, but these terms seem equally applicable to the underlying Caitanya sect. At least so far as secular auxiliary entities of the religion are concerned, the phrase most commonly used seems to be the International Society for Krishna Consciousness, and its acronym, ISKCON. However, as the Appendix discloses, more than a dozen separate entities exist in the United States with the same or nearly the same name.

The religious umbrella for these units appears to be a vaguely described group of "commissioners", each assigned to a territorial segment on a world-wide basis, yet there seems not to be any central unit of a structural or organizational nature. About all that can be said is that all of the local or regional units are devoted to the common deity, Krishna.

The tenets of the religion itself are unfamiliar ones, but this in no way indicates anything of substance in this case. The world is filled with countless religions unfamiliar to non-believers. See, for example, *Malnak v. Yogi*, 440 F.Supp. 1284 (D.N.J. 1977), dealing with the Science of Creative Intelligence or Transcendental Meditation.

Perhaps all that can be said is that each religion, familiar or strange, is marked by the faith of its adherents. "Faith is the substance of things hoped for, the evidence of things not seen." New Testament, *Hebrews*, xi, 1. As a perceptive skeptic once put it, "Faith may be described briefly as an illogical belief in the occurrence of the improbable." *H.L. Mencken*, "Prejudices", Series iii, p. 267.

The difficulty, of course, is that to enter into the question of faith is to invite tests of the kind employed during the Spanish Inquisition, and our secular courts have historically avoided such entanglements.*

The issue at trial evoked considerable testimony approaching the subject while also skirting or avoiding it. This is due to the fact that the plaintiffs assert that the solicitation of donations, or the distribution of literature or merchandise intended to secure donations, is an essential part of a Krishna religious ritual called sankirtan. The defendants' position is that the claim is a sham and no more than a cover for fraudulent and scheming solicitations.

So far as the bulk of the religious literature put in evidence discloses, sankirtan consists of a display of the complete emotional and spiritual unity of a true believer with Krishna, which takes the form of an ecstatic dancing, singing, chanting, playing of musical instruments, and the like. Plaintiffs do not contest this, but say that obtaining donations is an essential part of sankirtan, and so is itself called sankirtan even in the absence of its other components.

This dispute, and its resolution (if it could be resolved) has no influence on the outcome of this suit. The ISKCON units and the devotees of Krishna are at least auxiliaries seeking to raise funds for the advancement of the religion, whatever its name, and to proselytize or propagate the faith, even though the former may predominate.

■ It is well established that colporteuring, by itself, comes within the protection of the "free exercise" clause. See *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Jamison v. Texas*, 318 U.S. 413, 63 S.Ct. 669, 81 L.Ed. 869 (1943); *Largent v. Texas*, 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Follett v. McCormick*, 321 U.S. 573,

64 S.Ct. 717, 88 L.Ed. 938 (1944), for example.

New Jersey law recognizes religious activity, or activity in support of religion, as falling within the sphere of charitable works. In *MacKenzie v. Trustees, etc.*, 67 N.J.Eq. 652, at 665, 61 A. 1027 (E & A, 1904), and in *Noice v. Schnell*, 101 N.J.Eq. 252, at 259, 137 A. 582 (E & A, 1927), its then highest court quoted with approval and followed the classic definition expressed by Mr. Justice Gray, in *Jackson v. Phillips*, 96 Mass. 539, at 556 (1867):

"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government."

■ To come within the protection of the "free exercise" clause, it is not necessary that the form of exercise itself be a ritual or ceremony typical of or required by the particular religion. At least so far as fund raising is concerned, it is clear from the cases that such activity, carried on to advance and support the religious purpose, is sufficient in and of itself.

Again, local law provides a good example. By referendum of November 3, 1953, *N.J. Const., 1947*, Art. 4, sec. 7, par. 2 was amended to legalize the conduct of bingo games and raffles by bona fide charitable and benevolent or civic organizations, so long as "the entire net proceeds of such games of chance are to be devoted" to the charitable or public-spirited uses. Religious purposes are expressly included.

---

* New Jersey has a statute regulating charity fund raising, whose provisions are clearly intended to prevent misleading or fraudulent solicitations, as well as to prevent the raising of funds in the name of charity but for the primary benefit of professional fund raisers. See the Charitable Fund Raising Act of 1971, NJSA 45:17A–1, et seq. At trial, the court was told that the corporate plaintiff was in process of registering, but no proof that it had was ever presented.

It is true that the enabling statutes, NJSA 5:8–1, et seq., and the rules and regulations of the Legalized Games of Chance Control Commission, N.J.A.C. 13:47–1.1, et seq. impose strict regulatory controls and detailed reporting and accounting to assure that only bona fide qualified organizations are licensed, that commercial or fraudulent aspects are excluded, that the gross receipts are not siphoned off, and that the entire net proceeds of the games are actually devoted to one or another of the authorized purposes.

The point is, however, that the games may be run by a church, or by some auxiliary secular organization in support of a church, without regard to whether gambling is a sinful activity from the standpoint of the particular religion.

■ Thus, the court finds from the evidence that the ambulatory colporteuring which plaintiffs wish to carry on within the Sports Complex comes within the protection of the free exercise clause, without regard to whether the activity is in fact one required by the Krishna religion and without regard to whether it is or is not part of the ceremony of sankirtan.

The question so decided is quite different than that which would arise if the activity were an actual religious ceremony, and if the observance of it involved the expenditure of funds by the Authority, see *Gilfillan v. City of Philadelphia*, 637 F.2d 924 (CA 3, 1980).

## IV. *The Forum Issue.*

The major issue presented is whether the Sports Complex, as it was built and operated at the time of trial, was a "forum" at all.

There are relatively few decisions dealing with the point, no doubt because few, if any, organizations would attempt to engage in colporteuring in locations that cannot reasonably be regarded as public forums. The invisible, indefinable and thin division that constitutes "social order" is a division marked by self-restraint. It is the common understanding that insistence upon the unlimited exercise of "rights" by one will inevitably degrade and invade the "rights" of others, or, as the Latin expression goes, *sic utere tuo, ut alienum non laedas.*

In those cases where the point has been dealt with, the Supreme Court has not hesitated to make clear that merely because someone wants to express views, or proselytize, or colporteur, or carry signs and banners, it does not follow that they have a constitutional right to do so whenever and however and wherever they please. When that premise has been advanced, the Supreme Court has rejected it · vigorously, forthrightly and repeatedly. It has emphasized that the United States Constitution does not forbid a State to control the use of its own property for its own lawful and nondiscriminatory purposes. It has said that it is a mistake to think that whenever members of the public are permitted to enter a place owned and operated by government, then that place becomes a "public forum" for purposes of the First Amendment.

It has said that such a principle of constitutional law has never existed and does not exist now. It has said that the State, no less than a private person, has the power to preserve the property under its control for the use to which it is dedicated.

See, for example, *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); and *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

■ The point is significant because when the government property is not a "public forum", it need only demonstrate a rational basis for the restraints imposed or, put another way, show that they are not arbitrary, capricious or invidious. Thus, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) held that a municipal decision not to accept political advertising (even though paid for) on its mass transit system was warranted "in order to minimize chances of abuse, the appearance of favoritism, and the risk of *imposing upon a captive audience*". 418 U.S. at 304, 94 S.Ct. at 2718 (emphasis added).

In *Jones v. North Carolina, etc.*, 433 U.S. 119, at 134, 97 S.Ct. 2532, at 2452, 53 L.Ed.2d 629 (1977), the Court said that since the prison was not a public forum, the authorities need only demonstrate "a rational basis" for the regulation under challenge. The decision in *Lehman, supra*, 418 U.S. at 303, 94 S.Ct. at 2717, put the test of policies regulating advertising space on the basis of whether they were "arbitrary, capricious, or invidious."

In the present case, it is important to note the difference between what the enabling Act empowers the Authority to do, and what it had done as of trial time. Thus, NJSA 5:10–2 expresses a legislative policy to provide stadiums, facilities for horse racing, "forums" and exhibitions for the public. Similarly, NJSA 5:10–6, in granting the Authority power to construct, operate and maintain projects on a site not to exceed 750 acres of Hackensack meadowlands, speaks of stadiums, a race track and other buildings suitable for the holding of "public meetings" and other uses such as "recreation areas".

The opinion of Judge (now Justice) Pashman, in upholding the constitutionality of the enabling Act under State law, *N.J. Sports etc. v. McCrane*, 119 N.J.Super. 457, 292 A.2d 580 (Law, 1972), modified and affirmed 61 N.J. 1, 292 A.2d 545 (1972) referred to the powers and plans to provide "forums", facilities for "public meetings", as well as "parks" and "recreation areas" (119 N.J.Super. at 463, 292 A.2d 580). He mentioned "preliminary design" for a stadium, a race track, "an exposition hall, a hotel", a baseball stadium and a "20,000 seat arena." (119 N.J.Super. at 467, 292 A.2d 580). He mentions the power to create a "forum" again, 119 N.J.Super. at 477 and at 479, 292 A.2d 580. He refers to papers filed by the Authority chairman indicating that the complex, in addition to racing, will consist of "flowing stocked pools for fishing, an aquarium, enclosed all-weather tennis courts", 119 N.J.Super. at 490, 292 A.2d 580.

The fact of the matter is that at trial time the Authority had not yet constructed or provided any facilities other than the race track and the stadium, with the supporting facilities. There was no facility that could be regarded legitimately as a "forum", a place for "public meetings", or any "parks" or "recreation areas", or any "exposition hall", or "hotel" or "20,000 seat arena". There were no fishing pools, there was no aquarium, and no enclosed all-weather tennis courts. All these envisioned and empowered projects were in the future as the Complex gradually became reality built on the dream of swampland.

The prospectus for the 1978 bonds, Exh. C–4, at p. 13, in discussing plans for the 20,000 seat arena opened in August, 1981, mentions the availability of some 40,000 square feet of potential exhibit space which, if used in conjunction with the arena area floor space, would provide the facility with the capability of supporting industrial and leisure-oriented exhibits and shows. It may well be that such uses, when scheduled, will support the placement and availability of booths for the exchange of money arising from fund solicitation by organized charities, including plaintiffs, on a basis like that dealt with in *Heffron v. International etc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

The record here, however, was compiled before the Arena was completed and so does not contain any factual basis for considering the Authority's challenged policy in respect to the Arena, and the court is limited to considering the Complex as it stood, with just the race track and the stadium.

In any event, the fact is not in dispute that the development of the Complex has been phased in stages. The basic figures set out above in Part I—*The Sports Complex*, show that the construction and operation of the race track was the *sine qua non* to the sale of the revenue bonds and to the start of any part of the project. It was built and began operations in September, 1976, see Exh. C–4, p. 12. The stadium began operations a month later, *idem.* Even before the race track was open, the Authority was conducting race meetings at other track facilities and deriving revenue

from them. The tabulation in Exh. C–4, p. 15, shows that in 1976 the Authority derived more than $1 million in revenues from "offsite racing". This revenue dropped to $127,218 in 1977 as the racetrack came into full operation and dropped to zero in 1978.

In 1977, the race track operated for 280 racing days, with net racing revenues of more than $84.4 million (after purses, remittances to the trust account and to the State, but before racing expenses), or an average of $301,460 for each racing day.

In the same year, there were 14 professional football games (i.e., Giants) and 21 professional soccer games (i.e., Cosmos) for a total of 35 events involving the two major users, plus 9 other events for a grand total of 44 days. See Exh. C–4, p. B–6, footnote 1. For that year, stadium revenues (before Stadium expenses) were $6,357,821 which averages $145,000 a day for each of the 44 days. This average per day is a little less than half the average per racing day, but there were more than 6 times the number of racing days than there were stadium days. So, as these ratios indicate, the track revenue was more than 13 times the stadium revenue.

It was not until about two full years of operation that it became financially feasible to market bonds to enlarge the racetrack by adding the fourth floor restaurant and betting windows, and to undertake construction of the Arena, as shown by Exh. C–4, the prospectus of December 1, 1978, whose figures embrace the period from September, 1976 to the end of October (10 months) of 1978.

As the Prospectus points out:

"Future Facilities. The Authority has given consideration to the future development of available land at the Sports Complex site, and it expects that further development will occur. Plans for such future development are not yet sufficiently advanced to be included in the financial forecasts." (Exh. C–4, p. 14)

Thus, while the power exists to further develop the site to provide forums, places for public meetings, parks, recreation areas, a hotel, a baseball stadium, flowing stocked pools for fishing, an aquarium, enclosed all-weather tennis courts, and the like, none of these had been provided at trial time and they simply do not exist except, as noted above, to the extent that the new Arena may constitute a forum or place for public meetings, depending on the events scheduled from time to time, but in respect to which there is no evidence in the present record.

Certainly, it cannot be successfully maintained, as a matter of local law under the enabling Act, or as a matter of constitutional law under the First Amendment, that the Authority is obliged now and at once to provide a public forum at which plaintiff and others may engage in the activities they desire. All of the cases on the subject deal with what exists, and none the court is aware of remotely suggests that where a facility in existence is not a public forum, there is some undefined obligation either to make it one or to provide one.

■ The record in this case is clear that neither the race track nor the stadium is designed, built, intended or used as a public forum. The same is true of the blacktop automobile parking areas bordering them. For this reason, neither the plaintiffs nor any others desiring to carry on like solicitation for their own ends may legitimately advance the claims made here.

The evidence in the case, supplemented by the observations made at the two views (one for the racetrack and the other for the stadium) shows that the patrons come to the Complex as their destination, to attend the event scheduled. They pay to enter the site, they pay to enter each structure, and stay within it until ready to leave. Patrons may not move freely from the structures to the parking areas and back again on the same admission ticket.

At the daytime event at the stadium viewed by the court, there were some early arrivals who set up tables, grills and the like until ready to enter the stadium, but it would strain credulity to say that they came to the Complex for a picnic in the park. They came to attend the game, and

the picnics are incidental to and an inherent part of that attendance. Those who picnicked were a small fraction of the total, and by the time the main group has arrived the lots are paved with cars for acres around, and once the game begins there are no people in the parking areas at all. Once the game is over, all but a hardy few leave as rapidly as the surrounding roads and traffic patterns permit.

At the race track there was no sign of picnics, even though it was still daylight at 6:30 PM. When the racing ends, it is dark (even with daylight saving) and there is no lingering in the parking areas.

The proffered testimony of the witness Kent did not show otherwise, or have any tendency to. His opinions merely expressed the view that any open area can physically be put to use for any of the wide variety of uses that open areas can be used, disregarding the fact that the actual use was quite different and did not include the imaginary uses to which he testified. He ignored the realities of the situation, namely that patrons come to go to the race track or the stadium, and do not come for other purposes. He ignored the fact that the walkways outside and inside the stadium are essentially empty during the game, except during half-time when the interior walkways are extremely crowded with those in line at food counters or at restroom doors, and that movement is quite difficult.

Similarly, at the race track, his attention was centered on watching individual patrons or groups of patrons but ignored the pari-mutuel operation which is the financial support of the entire project. He was unfamiliar with or did not notice the numerous displays, by boards or closed circuit TV screens throughout the building, which are used to disseminate the figures for the odds relied on by every bettor, skilled or not. From his testimony it would be difficult to tell that anyone was much interested in the races or the betting, a perspective that is at odds with reality.

Although received, his testimony both as an observer of fact and as expert opinion was of little weight and unpersuasive.

There is nothing that the court observed in its two viewings to support the proposition that either structure or the areas around them have any sensible resemblance to streets, parks or other public places that have "immemorially been held in trust for use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, at 515, 59 S.Ct. 954 at 964, 83 L.Ed. 1423 (1939). The only similarity between a "park" and the "parking areas" at the Complex is semantic, in that the same four letters appear in both terms.

V. *The Giants and the Cosmos.*

The New York Football Giants, Inc. is a privately owned, profit-making corporation. It is the primary tenant of the stadium and its parking area under a 30-year lease signed August 26, 1971. Under that lease it is entitled to exclusive possession of the property on the dates and for the periods specified. At times when it is not using the stadium facilities for its own activities, the Authority may allow use by others.

The Cosmos Soccer Club, Inc. is also a privately owned, profit-making corporation. It uses the stadium facilities at times allowed by the Giants' lease, under a 10 year license signed in October, 1977.

The Authority derives revenue from these uses on a formula basis that deals with parking charges, admission fees, concessions and the like, the effect of which is for a sharing of the revenues between the Authority on the one hand and the Giants or Cosmos on the other.

The number of occasions when the stadium is in use by one or the other, and at which revenues are generated, is limited by the particular season for football or soccer, by the frequency of games during the season (including exhibition and play-off games), and by the system of playing games "at home" or "away".

The stadium is also used at other times for such purposes as college or high school football games, religious conventions, com-

mencement exercises, and so on. These uses are not numerous and do not generate the level of revenues produced by Giants games or Cosmos games. For a substantial part of a whole year, then, the stadium generates no revenues at all.

Under the arrangements with the Authority, these two professional sports organizations derive revenue from patrons for their own use in conducting their enterprises, hopefully at a profit. As to those aspects, each makes its own decisions.

Both were made parties defendant at the direction of Judge Stern when the case was assigned to him, due to the obvious and continuing interest which each would have in the outcome of the case.

The evidence was that plaintiffs made no request of either the Giants or the Cosmos, as they did of the Authority, and there is no evidence of a policy or rule or regulation of either, in its own right as tenant or licensee, to bar solicitation of funds, and so on, as the Authority has.

Despite this evident gap, it is the posture of plaintiffs that should the Authority policy be set aside, they will be entitled to enter and engage in the desired fund raising activity (by colporteuring or otherwise) even while the Giants or the Cosmos have exclusive possession for the conduct of their separate business activities.

Both private defendants take the position that plaintiffs failed to make even a prima facie case that either team has acted under color of state law, or that either team has deprived plaintiffs of alleged First Amendment rights.

As the court sees the matter, it is no doubt true that so long as the Authority policy is in force, the subject need not be dealt with by either the Giants or the Cosmos, at least so long as they do not perceive the policy as adversely affecting any interest or right of theirs under the lease or the license. On the other hand, a different posture would be presented if either one wished to allow plaintiffs to come in and engage in peripatetic solicitation and so on at a time when it had exclusive possession.

The reverse situation would occur if there were no Authority policy, or if it be held invalid, and either one wished to bar peripatetic solicitation at a time when it had exclusive possession.

Plaintiffs rely heavily on *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) for what amounts to the proposition that the nexus between the Authority's activities and those of the Giants and Cosmos is so close and so complete that if the Authority cannot bar the plaintiffs, neither can the Giants or the Cosmos.

 The argument claims too much. In the first place, as noted at the outset, *Burton* was an access case, not a First Amendment case. In the second place under the later Civil Rights Act of 1964, 42 U.S.C. § 2000a, and under New Jersey's Law Against Discrimination, neither the Giants nor the Cosmos could bar access to anyone on grounds of religion or creed, since the stadium comes within the definition of both statutes as a "place of public accommodation". And those statutes both apply to such places even when wholly owned and operated by private interests. No "state action" need be shown.

Put another way, Mr. Burton was found entitled to enter the Eagle Coffee Shoppe just as any other customer, without regard to his race or color, and be served in the same way and to the same extent. Nothing in *Burton*, or in any other case, remotely suggests that having gained access, he could further claim a constitutional right to engage in First Amendment activity within the restaurant, such as distributing literature for donations, or make a speech, or carry a placard, or whatever, contrary to the rules of the establishment.

 So, here, even if there were no Authority policy, the Giants and Cosmos are obliged by law to allow access to all persons who seek to attend, without regard to "race, color, religion or national origin" (under the federal law), and without regard to "race, creed, color, national origin, ancestry, age, sex, marital status or liability for ser-

vice in the Armed Forces" or to "physical handicap" (under the State statute).

The Authority policy is not addressed to any limitation on access to a place of public accommodation, nor is it addressed to pure speech, as noted above. It is directed to conduct, in whatever form, designed to solicit funds from the patrons.

■ As private enterprises, the Giants and the Cosmos would have the same right as any other to regulate the activities of its patrons while they are on the premises of which either one has exclusive rights to possess, and actual possession, at the time.

■ Even if constitutional principles applied, and the court is satisfied that they do not, the fact that cheer leaders and bands are allowed to parade, dance, sing and play musical instruments on the playing field would not mean that some group of patrons could do the same in the stands, in the corridors or outside in order to raise money.

### VI. *Rationale for the Authority Policy.*

The Authority policy was shown to have a rational basis, and not to be arbitrary, capricious or discriminatory. These are the tests for locations that are not public forums.

■ Even if this were a public forum, which the court has found it is not, the special attributes of the facility would be relevant since the significance of the governmental interest is to be assessed in light of the characteristics, nature and functions of the particular facility involved. See *Heffron v. International Society, etc.,* 452 U.S. 640, at 650, 101 S.Ct. 2559, at 2565, 69 L.Ed.2d 298, at 308 (1981).

■ In the first place, the testimony and exhibits utterly failed to show any rational resemblance between city streets, parks and other "forum" like locations, and the Complex. As the discussion above has shown, patrons come to the Complex to attend particular events, attend it while there, and then depart. So far as the racetrack and the stadium are concerned during such periods, they bear no resemblance even to fairs, subway stations, airports, convention centers or other such facilities and activities.

Both structures show every sign of thrifty design to limit construction costs to bare essentials. For the size of the stadium for example, and the number of patrons present at one time, the structure is "snug". Minimum clearances are found in the seats, stairs and aisles. Direct movement for maximum flow is encouraged by the design. Escalators move directly from the ground to each of the three levels. Before the game they all move upward. For a period, one moves up while another moves down, and at the end of the game all move down. The parking area fills up to its outer boundaries. It empties with remarkable speed. Thus, despite the "bare essentials" approach, it is designed to meet the patron's interests effectively and efficiently, no doubt on the theory that an unhappy patron may not return.

The same is true of the race track, although here there is a further aspect of prime importance, and that is not to allow any kind of interference with the pari-mutuel betting activity which is the life blood of the whole project.

The racing revenues are derived from commissions on the gross bets. Exh. DS–14, the breakdown for July 31, 1979, shows that the commissions on the 10 regular races are 17%; on the daily double or exacta they are 19%, and on the trifecta they are 25%. Part of this commission or "take-out" goes for payments to the State, for purses and to the trust account. The Authority's share runs from 10.5% to 16.5%. Exh. DS–15 shows how these bets distributed on the same day among various betting pools, among various denominations of bets (from $2 to $100), and at various locations of betting windows. It shows figures for per capita wagers on that day, the average for 1979 through that day, and the corresponding figure for a year before.

It is a characteristic of pari-mutuel betting that the only money at risk is the money bet by the patrons. In effect, they bet against each other. The money bet by

those who lose is used to pay those who win, and the pay-off odds are determined entirely by the amounts available.

But, when the money is bet, it goes into pools, from the gross amount of which the commission is subtracted and only what is left is distributed to the winners. When the commission is 17%, as it is for the 10 regular races, this means that for each $100 bet a commission of $17 is deducted and only $83 is distributed to winners.

Also, since some of the patrons win their bets in each race, they are paid back their original bet plus their share of the distribution (all after commission) thus providing funds for more or larger bets in later races. The "handle", which is the aggregate of all gross bets, is the figure on which the commission is calculated. It does not imply, by its magnitude, that all the patrons actually had that amount of cash in their possession. This is because the net after commissions is redistributed among those patrons who had winning bets, and so is then available to make new ones. This recirculating process means that the total handle is a result of a pyramiding process in which the same recirculated dollars have a commission deducted each time they are bet, each time they are "handled".

Any excellent discussion of this aspect of pari-mutuel betting is found in *Scarne*, "Complete Guide to Gambling" (Simon & Schuster, N.Y. 1961) at pp. 56–57, a copy of the passage being attached as Exhibit B.

Thus, as the Authority witnesses testified, the solicitation of money from patrons, to the extent it is successful, removes available funds for betting to a greater degree than the non-compounded commission percentage would make it appear. Also, an interception of patrons will have a tendency to cause arrival at a window after the bets are closed, and this adversely affects the revenue. Some patrons may prefer to attend other tracks where there are no solicitors, and this would reduce revenues.

In short, except for the parking charge and admission fees paid by the solicitors, every feature of the desired activity would tend to run counter to the generating of revenue from betting, and so would adversely affect the one activity which, by itself, supports all the others.

The track is also unique in that large numbers of patrons are holding or handling cash for every bet they make and every bet they win. The presence and exposure of cash under such circumstances is unique and wholly unlike what might be found elsewhere. Thus, there are unique and especially strong considerations of safety, quite aside from matters of movement, congestion, and other elements of safety.

The presence and exposure of cash possessed by a large number of people also enhances the risks of misrepresentation, fraud or other misconduct which, in turn, would have a significant likelihood of causing disorder.

The patrons at the racetrack also form a set of very definite groups of captive audiences, usually located in the vicinity of each row of ticket and cashier windows. Their general locations, and the aggregate bets placed at each, are shown on Exh. DS–15 under the heading "Divisions". Plaintiffs offered testimony that they would not approach those who were seated in restaurants, in lounges, or standing at food counters and the like, but did intend to approach patrons in the spaces surrounding the betting windows, i.e., in the "betting ring."

In the context of a gambling facility of this kind, it seems to the court rather obvious that the patrons are more "captive" in the areas around the betting windows than anywhere else in the building. A patron who doesn't bet will be sitting somewhere, but bettors will inevitably be moving to and from one or another betting window, because they cannot bet anywhere except at the windows.

All in all, taking the specific features of each structure and the ways in which they are used at the very times that plaintiffs' wish to solicit, the court is satisfied that the policy is warranted, by any or all of the tests discussed.

In arriving at this conclusion, the court has taken into account the fact that any

modification of Authority policy could not legally be limited to the plaintiffs. If the Complex were opened up to the plaintiffs, the Authority would be faced with the need to open it up to others as well.

The fact that the Hare Krishna devotees may regard peripatetic solicitation as an element of religious ritual does not entitle them to superior rights in comparison with adherents of other religious groups that raise money by solicitation but not as a religious ritual. It is also true that in the context of this case, religious groups as a whole do not enjoy greater rights than members of non-religious groups for like purposes.

Thus, an opening up for solicitation by plaintiffs would be to open up for all, and in view of the physical and dynamic characteristics at both the race track and the stadium, the Authority has no reasonably effective means to achieve the legitimate purposes of its policy. While courts in some cases of true public forums have expressed their own views in respect to methods for dealing adequately with the problems involved, some measure of sound judgment must be left to those responsible for the day-to-day operations and for their success.

The court has carefully considered the decision in *Heffron,* supra, but finds nothing in it to suggest any obligation to provide booths for the plaintiffs and others to distribute literature and solicit funds. The fact is, as mentioned in footnote 4, that the Minnesota State Fair was set up or structured with more than 1,400 exhibit and concession booth spaces, with several hundred applicants denied space for lack of room. Footnote 5 lists some of the fund raising organizations that rented booth space for that purpose on a first come, first served basis. Given this structural arrangement, the Supreme Court regarded the fair as a "limited public forum" (452 U.S. at ——, 101 S.Ct. at 2568, 62 L.Ed.2d at 311).

Nothing of this nature, either structurally or functionally, exists at the racetrack or the stadium. The "booths" at the racetrack are the nearly 600 betting windows. At the stadium, there is a handful of stands on wheels for the incidental concessions related to the convenience of patrons (for food, etc.) or related to the event (for souvenirs, etc.). These are placed outside the stadium before the game begins, and are moved inside after the patrons have entered.

Nothing about either arrangement remotely suggests that either facility exists to provide a means for a great number of exhibitors to present their products or their views, on a temporary basis, to "fairgoers" who attend in order to inspect the exhibits. Functionally, either the Authority, or the Giants or Cosmos, could have undertaken to use their own personnel to provide this bare minimum of booths for food or souvenirs as a convenience to their patrons. That they have chosen to delegate the function to a concessionaire does not alter the character of the function.

VII. *Evidence Questions.*

During trial, several evidence questions arose during the testimony of plaintiffs' witness Kent. Originally, another witness, a Mr. Zupan (sic) had been engaged, and he had recorded videotapes of patron movement at the stadium, and took some counts as well, under a court order for entry and inspection under Rule 34(a)(2). His employer, the court was told, objected to his becoming involved in outside litigation, and Mr. Kent was engaged in his place. Mr. Kent offered drawings, charts and calculations based upon the videotapes recorded by his predecessor and this material was objected to since the underlying data was never authenticated, see Fed.Ev.Rules 703 and 705.

■ On several occasions, the court observed that if plaintiffs could not secure the attendance of the needed witness voluntarily or by subpoena, the court would compel his appearance. No request for aid was ever made. The law simply does not allow the course followed by plaintiffs, and the drawings, charts and calculations based on the videotapes recorded by another not under his supervision cannot be received, nor can the opinions that rested on them.

The ruling does not seriously disadvantage the plaintiffs. In the first place, the court conducted its own viewings and the observations made were much more informative. In the second place, the sort of analysis prepared by the witness Kent was the kind of study traditionally made in locations quite unlike the stadium and useful for purposes other than deciding the questions before the court. He approached the subject by closely studying the trees and never observed the forest.

█ Another problem arose in connection with films taken at inspections outside the Rule 34 order, without notice to defendants. The issue here was one of sanctions, since the film was taken in Mr. Kent's presence and under his supervision. The taking of films without notice, by itself, inevitably raises needless questions about issues going to weight, such as whether what was recorded is a fair sample. The presence of the adversary reduces this risk and reduces trial time. Also, plaintiffs knew that defendants insisted that inspection and photographing be conducted under control of a Rule 34 order, yet they disregarded the arrangement.

While the court does not countenance or excuse this conduct, it has decided to allow the Kent photographs to be received in evidence. It is reluctant to deprive plaintiffs of the only potential underlying data gathered by its only expert, and the photographs were supplemented by the viewing, thus neutralizing or minimizing the risk of skew or bias in the pictures.

VIII. *Conclusions.*

From the findings of fact and conclusions of law embodied in the foregoing opinion, the court concludes that plaintiffs have not carried their burden of persuasion, and that final judgment should go for defendants.

As the court has observed in several places, the rulings here apply to the racetrack and stadium and their parking areas. No opinion is expressed in respect to the new Arena which was not in existence at trial, but which has opened within the month.

Also, nothing was presented, considered or decided in respect to any matter of State law. As the parties are aware, New Jersey's Supreme Court has followed California in applying State Constitutional provisions to at least some categories of private property. See *Robins v. Prune Yard Shopping Center*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), and *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980).

This state law view, expanding local law beyond the boundaries of the First Amendment, is not federal law, *Prune Yard etc. v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). That question is left for the courts of New Jersey to decide.

Submit order accordingly.

## APPENDIX A

There was considerable testimony about the Krishna sect as a religious group, and about the relationship to it of the New York corporation which is a plaintiff. A large number of printed bound books said to contain scholarly dissertations about the religious sect, as well as commentaries and philosophical analyses were introduced in evidence. All of these were in English text, interspersed considerably with phonetic spellings of Sanskirt words. None of these purported to give any outline or description of the structure and arrangement of the religious sect itself.

The sect itself appears to be a modern descendant of an offshoot of Hinduism initiated by Lord Caitanya, attributed to some time in about the year 1486.

The main feature said to have been developed by Lord Caitanya (sometimes implied to be a reincarnation of Krishna visiting the earthly sphere for one of his "pastimes") is that while the practices before him were traditionally engaged in within temple buildings or in solitude, he took the performance of religious ritual and ceremony out of the temples and to the general population. It is also clear that another feature of the offshoot developed by Lord Caitanya was to discard the notion that intense study of and complete familiarity with the array

of holy books and scholarly writings was necessary to achieve spiritual unity with Krishna. Whether true or not as a matter of fact, the volumes dealing with Lord Caitanya indicate that he popularized the themes of the religion, not only by taking religious ritual and ceremony out of the temples but also by claiming that it was only necessary to chant the name of Krishna in a specified fashion often enough to achieve spiritual unity. The chant, as repeatedly described, may be called a "mantra", and runs thus:

> "Hare Krishna, Hare Krishna, Krishna Krishna, Hare Hare/Hare Rama, Hare Rama, Rama Rama, Hare Hare."

Caitanya is quoted in some of these books as expressing the view that the sincere chanting of these words is the equivalent of complete knowledge of what is written in the holy books, The Vedas, and makes a detailed or scholarly study of them unnecessary.

He is also said to have been so carried away in spiritual ecstasy by the continuous chanting of the mantra words as to break out in dancing, laughing, singing, playing musical instruments, and like activities as to draw or incite others to gather about and join him.

It is this chanting, dancing, singing, and the like out in the open outside the temples that seems to have been the core of the Caitanya theme, and it is this combination of activities that the books identify as "Sankirtan". Although impossible to summarize accurately or with precision, this is the kind of emotional and ecstatic conduct to which is ascribed the power of Caitanya to attract others to accept Krishna as a form of direct proselytization or propagation of the faith.

Unlike the formal approach earlier in vogue, this method of direct attraction was claimed by him to be capable of drawing to the faith, and accepting, "all kinds of agnostics, atheists, skeptics and unfaithfuls and swallow them in the flood of love of God". In some respects, his philosophy seems to carry some of the features of Buddhism.

See, especially, the account and philosophical discussion in "The Teachings of Lord Caitanya", Exh. P–32, pp 185–215. The clear impression from these and other passages is of a religion of transcendental character in which all material and physical aspects of earthly life are put aside and replaced entirely with spiritual concepts. "Only when one can understand that there is no difference between the Supreme and His name can one be situated in Krishna consciousness". *Idem.* p. 201.

Put another way:

> "A person who is constantly engaged in devotional service to Krishna and who chants His holy name becomes so transcendentally attached to the chanting that his heart becomes softened without extraneous endeavor. When this happens, he exhibits transcendental ecstasies and sometimes laughs, sometimes cries, sings and dances—not exactly in an artistic way, but just like a madman". *Idem.,* at 208.

Very little is found in these translations about the activity of soliciting funds or selling books or literature, which form the focus of this case. To the extent that the subject of wealth or personal contributions is concerned, what is mentioned tends to be the other way around, that is by way of giving by those converted to the religion by way of preparing to shed material things. In the same volume, Exh. P–32, there is an account of two government officials inspired by Lord Caitanya to retire from service and join his Sankirtana movement. One of them is described, after completing ritualistic preparations, as returning home and dividing his wealth. Half was distributed to brahmanas and Vaisnavas, "persons engaged in the Supreme Lord's transcendental loving service". Another quarter was distributed to his relatives and dependent family members. The final quarter "he kept for personal emergencies. * * * The twenty-five percent of his accumulated wealth which he kept for personal emergencies was deposited with a good business firm, since in those days there were no banks." See, pp. 43–44.

This seeming conflict, of course, implies no lack of genuineness to the Caitanya sect of the Hindu religion, any more than does the vengeance of the Old Testament when contrasted with the concept of absolution or forgiveness of the New Testament in a more familiar religion.

By and large, however, the bound books in evidence appear to deal with the characteristics, philosophy, tenets and ritual of the Caitanya sect as practiced in India. Differences appear in respect to the Krishna movement as transferred to the New World. This process is attributed to Srila Saccidananda Bhaktiuinoda Thakava, who is said to have initiated the teachings of Lord Caitanya in the Western World at McGill University in Canada in 1896. See dedication at page v. of Exh. P. 32.

The year 1896, as that dedication discloses, was also the year of the birth of A.C. Bhaktivedanta Swami, whose preface indicates that the New York temple had been established by 1968. Exh. P. 32, page xii.

It was evidently in New York that the activity of raising funds by the solicitation of donations in exchange for token gifts of trifles, or in exchange for the distribution of magazines, pamphlets, books, phonograph records and audiotapes, was developed.

The witness Jayaduarta Swami testified that he has been a member of the New York Temple since 1968, and active there daily for 1968, 1969 and part of 1970. In the past few years he has been in California.

He locates the headquarters in 1968 at 26 2nd Avenue in New York City. During 1969, it was moved to 61 2nd Avenue in New York City where it remained until August, 1970 when it was moved to the present temple at 439 Henry St., New York City.

He put the number of devotees in 1968 at about 25, and in 1969 at about 50 to 70. In 1968–1969, groups would go out on Saturdays and Sunday, chanting and dancing. They may have done some collecting by passing a basket. There was no literature distribution at that time.

Some books were published in 1968 but were not used for distribution. He identified Exh. P–4, the "Bhagavad-gita" as a later edition of a 1968 volume. Books were published in about 1972, and were not used for distribution until about 1971 or 1972. There was not large scale distribution until about 1975.

Before book distribution began, the practice was to go to a local park and chant the Hare Krishna mantra for several hours. Magazines were distributed to some extent. The 1969 chanting parties went out more often in the evenings.

There was a phonograph record album in 1968, but it was distributed at the Temple school, the Temple bookshop and at record shops. The use of phonograph records to solicit funds began in New York in about 1977.

Chanting and dancing groups went out on foot in 1968 and 1969, began use of subways in 1970, and thereafter began use of vans or buses to transport traveling groups.

The book publications, judging from the data on the flyleaf, indicate publication in the 1970's. The earlier ones carry the name of the Bhaktivedanta Book Trust as the publisher and copyright owner, with the designation "New York-Los Angeles-London-Bombay", and the name of "International Society of Krishna Consciousness", with an address in Culver City, California, as the distributor, evidently. The name "Bhaktivedanta", of course, is taken from the name of His Divine Grace A.C. Bhaktivedanta Swami, credited to be the founder of the International Society for Krishna Consciousness and the same person who evidently began the New York temple.

Just what the relationship is between the Book Trust, the several International Societies, and the religious sect as such was never made clear in the testimony and does not appear in the publications in evidence except, perhaps, by way of inference.

In any event, the paperback "Preaching is the Essence", Exh. P–17, is attributed to

the Founder of ISKCON as the author. This booklet, published in 1977, carries only the name of the Book Trust at an address in California but does not name the International Society at Culver City as the distributor.

From the testimony of the witnesses Romapada Das, Scott Ellis, Alexander Grodsky and Jayaduarta Swami, it appears that the religious sect itself is governed by a body of "commissioners", with each one in charge of a separate territorial region. Within each region the commissioner is responsible for the appointment of Temple presidents and other officers, who may or may not hold any corporate office for one or another of the several corporate entities, each of which in general carries the same name as the International Society for Krishna Consciousness.

Inspection of the "Cumulative List of Organizations" described in sec. 170(c) of the Internal Revenue Code of 1954 (Revised to October 31, 1978), published by the Department of the Treasury, Internal Revenue Service, as Publication 78 (3–79) shows a listing, on page 568, of 13 separate entities, all named "International Society for Krishna Consciousness", located at Washington, D.C.; Seattle, Washington; Honolulu, Hawaii, New York, N.Y.; Moundville, W. Va.; Houston, Texas; Denver, Colo; Berkeley, Cal; Philadelphia, Pa.; Cleveland, Ohio; Los Angeles, Calif.; Atlanta, Ga.; and Falls Church, Va.

The Bhaktivedanta Book Trust does not appear where it would, if listed, on page 109.

Two entities, possibly related to the Hindu religion appear on page 923: the Ramakrishna Vedanta Society of Massachusetts, Inc. (Boston), and the Ramakrishna Vivekananda Center of New York, Inc. (N.Y.C.).

Two others, also possibly related, are listed on page 1013: Sivananda Yoga Vedanta Center (D.C.), and Sivananda Yoga Vedanta Center (Hollywood).

Three entities with "Krishna" as part of the name appear at page 624: Krishna Foundation, Inc. (Chicago); Krishna Yoga Community (Honolulu); and Krishnamarti Foundation of America (Ojdi, Cal.).

The listed entities have evidently been organized under applicable local law to conduct and carry on secular aspects of the religious sect, such as to acquire and own land and buildings, and operate restaurants, book stores, shops and the like, but presumptively on a non-profit basis and for the support of the not formally organized religious sect.

There are, of course, no implications adverse to plaintiffs from these observations and inferences. First Amendment rights in respect to free speech and free exercise, as well as in respect to the Establishment Clause, are whatever they may be without reference to the organizational structure of the religion or sect, or of secular supporting entities. The solicitation of funds for worthy causes is historically and functionally a very broad activity and a great deal of it is unrelated to any religion in the sense of adherence, belief, ritual or tenet.

Although it is not seen as having any impact on the outcome here, it is somewhat puzzling to understand why the structure and relationship of the numerous entities was not presented in straightforward fashion. It is obvious, however, that the "International Society for Krishna Consciousness", named as plaintiff in a number of lawsuits throughout the country, simply is not a single entity. There are at least the 13 entities listed above (by location). They may all be related, as secular supporting entities, to the Caitanya religious sect with a common aim to spread the notion or philosophy of Krishna Consciousness or transcendentalism, or to raise funds to that end, or for the support of Temples, spiritual masters, Swami, and the like, but the court sees no need for not disclosing the facts about the relationship, or for giving the impression that ISKCON is a single entity when it is many. It may be that Krishna is the sole Godhead and that all who achieve spiritual perfection are in complete unity with him, but those are religious aspects and this is a secular court called upon by

secular plaintiffs to decide secular claims. To go beyond these lines would involve the court in "entanglement" with religion, which it may not do. The perception and wisdom of Matthew, xxii, 21, "Render therefore unto Caesar the things that are Caesar's; and unto God the things that are God's" is an expressive phrasing of the notions of forbidding establishment, assuring free exercise, and avoiding entanglement.

All in all, there was considerable testimony adduced by the defendants, largely through the cross-examination of Romapada Das, the direct testimony of Paul Dodenhoff (a former devotee) and of Alexander Grodsky, a CPA engaged to establish a basic accounting system for the N.Y. Temple, aimed at establishing that the desired activity for solicitation of donations and distribution for a donation of magazines, books, records and tapes was in fact a commercial enterprise rather than a free speech or free exercise activity. A videotape copy of a TV program, in the way of "investigative reporting" was offered and received for identification. The court declined to view the playback or read the transcript of the sound track, and concludes here that this tender should not be received in evidence in this case.

Whatever value the broadcast may have had to the general public, it cannot be regarded as acceptable proof on the issue of bona fides of the solicitation efforts. There was no foundation testimony beyond the uniformative fact that the material had been broadcast on TV stations. Such programs, no matter how sincere and well motivated in their purpose, do no more than reflect the editorial/news perception of the program producer. Everyone ought to know that for every minute of material broadcast, there probably were 5 or 10 or 15 minutes of material recorded that was eliminated "on the cutting room floor." There was no evidence to establish who the solicitors were or who the persons solicited were. In short, there was no authentication of this tender at all. None of it was seen by the court and none of it was considered.

There was also considerable testimony in respect to the financial records of the N.Y. Temple. Beyond any doubt whatever, if the N.Y. Temple carried the burden of establishing that the receipts from the kind of activity sought to be engaged in at the Sports Complex are in fact applied to the asserted religious purposes, it would have fallen far short of the mark. These activities are strictly cash activities, and the evidence showed clearly that those in charge have either no idea of acceptable internal controls to account for that kind of activity or else prefer not to be called upon to account.

There is no question that solicitors of donations are sent out with quotas. Documents provided on discovery unquestionably showed that to be so. Yet witnesses such as Scott Ellis, whose functions would indicate knowledge of such matters, blandly denied any awareness of them until confronted with the documents.

If this were an issue to be decided, the court's conclusion would be that the desired activity is no more than a "confidence" operation designed to obtain all the money possible, and to avoid keeping proper records to account for the adequate reporting of sums received and their applications.

The admission by Scott Ellis that the financial records were "edited" in respect to sankirtan parties, and that he supervised the editing (redaction) of those records, is enough by itself to make the records worthless.

The testimony of the CPA, Alexander Grodsky, by itself, is enough to show that the financial records are not a reliable source of information.

Despite all this, it is the court's view that the outcome does not turn on these issues, and it declines to ground its decision on the proposition advanced, despite the strong showing made.

## APPENDIX B

Excerpt from "Scarne's Complete Guide to Gambling", pp. 56–57

### HOW THE STATE AND TRACK CUTS BEAT DOWN THE PLAYERS

Nearly all racetrack bettors believe that the legal state and track take (15% plus 2%

breakage in New York) is the only handicap they must overcome to have a winning day at the races. This is true provided the bettor only bets on one horse in one race, but when he and other bettors re-bet winnings, and the nonwinners bet fresh money, the 17% handicap jumps to about 30% for the daily double and the nine races.

For example, on April 10, 1960, at Long Island's Aqueduct track, the mutuel turnover for the day totaled $4,372,721. The bettors actually risked about 57% of this total because, except for the first race and the daily double, in which only fresh money was bet, about half the winnings on previous races was re-bet.

On the opposite page is a table that shows how the 17% bite really works on the daily double and all nine races.

On this racing day at Aqueduct, the track bettors won back only 70% of the calculated sum risked, which means that track and state really took out a 30% bite of the money risked rather than the 17% which nearly all bettors believe they take.

If you still don't believe that pari-mutuel betting is a sure way to lose money in the long run, let me try to convince you with this hypothetical case. Suppose a factory owner who employs 1,000 workers wants to give them a day's outing at a New York racetrack. Suppose the track owners allow them the exclusive use of the track for that day, and suppose they can bet odd change. The benevolent factory owner gives each employee $10 on the condition that he bets the entire amount in the first race on any horse he likes and in any manner (win, place or show).

It is also stipulated that the 1,000 bettors are to be partners, dividing their winnings and sharing their losses after each race. The winners always turn their winnings back to the factory owner and he redivides

| Race | Betting Handle | Fresh Money | 83% Returned to Winners | 17% Take-off |
|------|---------------|-------------|------------------------|--------------|
| Daily Double | $ 343,814 | $ 343,814 | $ 285,367 | $ 58,447 |
| First | 261,561 | 261,561 | 217,095 | 44,466 |
| Second | 329,560 | 164,780 | 273,534 | 56,026 |
| Third | 422,002 | 211,001 | 350,261 | 71,741 |
| Fourth | 456,616 | 228,308 | 378,991 | 77,625 |
| Fifth | 499,028 | 249,514 | 414,193 | 84,835 |
| Sixth | 531,730 | 265,865 | 441,335 | 90,395 |
| Seventh | 611,477 | 305,738 | 507,525 | 103,952 |
| Eighth | 464,795 | 232,392 | 385,779 | 79,016 |
| Ninth | 452,138 | 226,069 | 375,274 | 76,864 |
| | $4,372,721 | $2,489,042 | $3,629,354 | $743,367 |

| Summary: | | |
|----------|--|--|
| $4,372,721 | Betting handle for nine races and the daily double |
| $2,489,042 | Calculated sum risked by bettors |
| $ 743,367 | State and track take including breakage (17%) |
| $1,745,675 | Total sum returned to winners |

the money equally among all the bettors. He wants everybody to have a good time. They all agree, and it sounds like fun.

They're off! Everybody has his $10 riding in the first race. After the finish the winners turn their tickets in to the factory owner, who cashes them and finds that, after the 15% state and track cut plus 2% breakage has been deducted, he has $8,300. He redivides this sum, and each of the 1,000 employees has $8.30 to bet on the second race. The winning tickets this time total $6,889, and when this is redivided each employee gets $6.88. This betting and redivid-

ing procedure is continued through all nine races. After the ninth race and the final redivision, each happy employee finds that his original $10 has shrunk to $1.86.

The state and track cut has taken $8,140 in legal deductions from the original $10,-000. If the track had run 18 races, each player would finally be left with a grand total of 35 cents. No comment needed.