INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., and Angus Murphy, on behalf of themselves and all Members of the International Society For Krishna Consciousness, Inc., Appellants,

v.

NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, William F. Hyland, John Degnan, Clifford Goldman, Michael J. Breslin, Alfred Linkletter, Adrian M. Foley, Jr., and Aubrey Lewis, Members of the New Jersey Sports and Exposition Authority, Individually and in Their Official Capacity, New Jersey State Police, Race Track Unit and Troop "B", John Krusas, Director of Internal Security, Individually and in His Official Capacity, Pinkerton, Inc., and Patrick Malone, Division Manager of Pinkerton, Inc., Individually and in His Official Capacity and Daniel Logatto, Chief of Police of East Rutherford, Individually and in His Official Capacity, the New York Football Giants, Inc. and the Cosmos Soccer Club, Inc., Appellees.

No. 81–3051.

United States Court of Appeals, Third Circuit.

Argued Aug. 3, 1982.

Decided Oct. 15, 1982.

As Amended Oct. 29, 1982.

Opinion on Denial of Rehearing and Rehearing In Banc Nov. 16, 1982.

---

Fisher & Moest, Barry A. Fisher, David Grosz, Robert C. Moest (argued), Larry J. Roberts, Los Angeles, Cal., for appellants.

Zazzali, Zazzali & Kroll, Newark, N. J., for New Jersey Sports & Exposition Authority; James R. Zazzali, Newark, N. J. (argued), of counsel; Kenneth I. Nowak, Newark, N. J., on brief.

Alfred W. Roberts by John Patrick Marshall, Jersey City, N. J., Richard J. Concannon, Paul F. Doyle (argued), Kelley, Drye & Warren, New York City, for New York Football Giants, Inc.

Fischer & Kagan by Jay D. Fischer, Clifton, N. Y., Max Gitter, Paul, Weiss, Rifkind, Wharton & Garrison, and Sidney H. Stein (argued), Stein, Zauderer, Ellenhorn, Friedman & Kaplan, New York City, for Cosmos Soccer Club, Inc.

Before ALDISERT and WEIS, Circuit Judges, and RE,* Chief Judge.

---

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

## OPINION OF THE COURT

WEIS, Circuit Judge.

■ Invoking the First Amendment, the International Society for Krishna Consciousness, Inc. challenges a policy that prohibits outside organizations from soliciting money at the race track and stadium in the Meadowlands Sports Complex in New Jersey. Although the complex is owned by the state, we hold that it is not a public forum, and that the policy is reasonable. Consequently, die-hard football fans and railbirds may anticipate some bad days for their favorite teams and steeds, but the irritation will not be compounded by the importunings of those seeking contributions for special interest groups. We will affirm the order of the district court upholding the "no solicitation" policy.

The International Society for Krishna Consciousness, Inc., a religious body, brought this action for declaratory and injunctive relief under 42 U.S.C. § 1983. ISKCON contests the refusal by the New Jersey Sports and Exposition Authority to allow the Society's members to distribute literature and solicit donations at the Meadowlands. Two organizations whose teams play their home games at the stadium in the complex, the New York Football Giants, Inc. and the Cosmos Soccer Club, Inc., were later added as defendants. The district court denied plaintiffs' claims for preliminary relief and, after a comprehensive hearing, refused to grant a permanent injunction.

The New Jersey Sports and Exposition Authority was created by the state legislature in 1971 to construct and operate a sports complex, including a football stadium and racetrack, in the Hackensack Meadowlands. N.J.Stat.Ann. §§ 5:10–1 to 5:10–38 (West Supp.1982–83). The certificate of incorporation establishes the Authority as "a public body corporate and politic, ... an instrumentality of the State exercising public and essential governmental functions...." Id. at § 5:10–4 a. The Authority is established in the Department of Community Affairs, id., and the Governor may veto any action that it takes. Id. at § 5:10–4 i.

After the stadium was built, the Authority gave a long-term lease to the New York Football Giants, and a license to the Cosmos Soccer Club, providing them with exclusive use of the stadium on designated days. The Authority and the two teams share the revenue from parking charges, admission fees and concession sales. On occasion, the Authority also leases the stadium for such events as high school and college football games, religious conventions, and commencement exercises.

The race track is operated directly by the Authority. It is located near the stadium, and the two structures share a parking lot. Although an admission fee is charged, pari-mutuel betting is the chief source of revenue from the track, and there are nearly 600 seller and cashier windows to facilitate the enterprise. As an added convenience, numerous closed-circuit television monitors inform the patrons of the shifting odds in the races.

Betting actually carries the entire Meadowlands project. It enables the Authority to meet its debt service and operating expenses. Without the race track proceeds, the Authority would be unable to pay its bond holders.

The Authority has adopted a policy prohibiting anyone from soliciting money or distributing literature at the complex. The ban does not apply to concessionaires selling souvenirs, programs, racing forms, or food and beverages. Other than that exception, the Authority's policy is uniform and non-discriminatory. All requests for permission to solicit funds or distribute literature have been refused. There are no booths or other structures available for use by outside groups.

ISKCON made two applications to the district court for preliminary relief which were denied for failure to demonstrate a probability of success on the merits. After a 15-day trial on the request for a permanent injunction, the court concluded that the Authority's policy is not unconstitutional.

In reaching this decision, the court found that "neither the race track nor the stadium is designed, built, intended or used as a public forum. The same is true of the blacktop automobile areas bordering them." The court also determined that the Authority's policy had a rational basis. The large crowds at the stadium and race track make free movement throughout the two structures and their surrounding areas essential. As the court observed, "[f]or the size of the stadium ... and the number of patrons present at one time, the structure is 'snug'.

Minimum clearances are found in the seats, stairs and aisles.... The parking area fills up to its outer boundaries. It empties with remarkable speed.... The same is true of the race track, although here there is a further aspect of prime importance, and that is not to allow any kind of interference with the pari-mutuel betting activity which is the life blood of the whole project."[1]

The private defendants, the Giants and the Cosmos, were joined at the direction of the judge who heard the request for a temporary restraining order. In its final adjudication, the district court, 532 F.Supp. 1088, apparently found that the two clubs were entitled to judgment for the additional reason that their activities did not involve state action.

On appeal, plaintiffs contend that the district court erred in formulating and applying the public forum doctrine. According to ISKCON, its proposal to distribute literature in return for donations is compatible with the normal activities at the Meadowlands, and therefore is subject only to reasonable restrictions rather than a total ban.

Defendants assert that the stadium and the race track are not traditionally associated with the exercise of First Amendment rights and consequently are not public forums. An additional argument is that ISKCON's proposed activity would disrupt the normal operations of the complex.

We accept at the outset that the Authority, being an instrumentality of the State of New Jersey, furnishes the necessary state action for a § 1983 suit and that the First Amendment protects the plaintiffs' solicitation efforts. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

It is important to recognize that members of the plaintiff organization, like other people, are free to enter the stadium or race track upon payment of an admission fee. Once there, they are free to speak with anyone they choose and upon any topic, whether it be religion, politics, the merits of the Giants' and Cosmos' opponents, or a "hot tip in the fifth race." They are free to

wave penants or wear clothes that demonstrate a point of view. None of these activities is proscribed by the Authority's policy, which does not in any way touch upon the content of pure or symbolic speech.

Nor does the prohibition single out ISKCON. No one who is not a concessionaire affiliated with the Authority or the teams playing on the field may solicit money for literature. The ban applies alike to all religious, political, charitable and civic groups. *Cf. Wolin v. Port of New York Authority,* 392 F.2d 83, 87 n.4 (2d Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (charitable groups permitted in bus terminal but not political protestors).

The extent to which the government may limit activity protected by the First Amendment depends largely on the locale where the speech or conduct takes place. Our initial inquiry, therefore, is whether the Meadowlands complex constitutes a public forum.

Not all public places are public forums. The Supreme Court has emphasized repeatedly that a place owned or controlled by the government does not become a public forum simply because members of the public are freely permitted to visit it. As the Court said in *Greer v. Spock,* 424 U.S. 828, 837, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976):

"Such a principle of constitutional law has never existed, and does not exist now. The guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' *Adderly v. Florida,* 385 U.S. 39, 48 [87 S.Ct. 242, 247, 17 L.Ed.2d 149]. 'The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' *Id.,* at 47 [87 S.Ct. at 247]."

*See also Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 538–40, 100 S.Ct. 2326, 2333–2334, 65 L.Ed.2d 319 (1980).

Although "the analytical line" between public and nonpublic forums "may

---

**1.** Other facilities planned for the Meadowlands include a baseball park, indoor tennis courts, and a hotel. In addition, a 20,000 seat arena was constructed while this litigation was in progress in the district court. Only the stadium and race track, and their parking areas, are at issue here.

blur at the edges," the distinction is a critical one. *U.S. Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981). First Amendment activity in a public forum may be restricted only by reasonable time, place or manner regulations that serve a significant governmental interest and leave open ample alternative channels for communication. *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. at 535, 100 S.Ct. at 2332. Governmental restrictions on a nonpublic forum are not evaluated by this standard. *U.S. Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. at 132, 101 S.Ct. at 2686. Instead, the government may prohibit all forms of communication so long as the ban is reasonable and content-neutral. *Id.* at 131 n.7, 101 S.Ct. at 2686 n.7; *Greer v. Spock,* 424 U.S. at 840, 96 S.Ct. at 1218.

▆▆▆ The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used. Streets, parks and sidewalks are the paradigms of a public forum because they have traditionally served as a place for free assembly and communication by citizens. *Hague v. C. I. O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). Similarly, municipal theaters and auditoriums are designed for and dedicated to expressive activities. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975).

A state fair has been described as a "limited public forum" because it exists to provide a temporary means of exhibition to large numbers of people. *Heffron v. ISK-CON, Inc.,* 452 U.S. at 655, 101 S.Ct. at 2568. Since the exchange of ideas is an essential part of the educational process, but the need for discipline and order is great, a public high school is probably a limited forum also. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506–07, 512–13, 89 S.Ct. 733, 736–737, 739–740, 21 L.Ed.2d 731 (1969); *see also Brown v. Louisiana,* 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966) (public library).

▆▆▆ Public forum status is not appropriate for a locale where the full exercise of

First Amendment rights would be inconsistent with "the special interests of a government in overseeing the use of its property." *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. at 540, 100 S.Ct. at 2334. For example, a prison is not a public forum for its inmates, because the exercise of these rights would conflict with the "legitimate operational considerations of the institution." *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 130, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977). *See also Greer v. Spock,* 424 U.S. at 838, 96 S.Ct. at 1217 ("the business of a military installation [is] to train soldiers, not to provide a public forum"); *Adderly v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (no public forum in "that part of the jail grounds reserved for jail uses"); *American Future Systems, Inc. v. Pennsylvania State University,* 618 F.2d 252, 256–57 (3d Cir. 1980) (residence halls at a state university not a public forum for commercial sales).

In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), the Supreme Court upheld a "managerial decision" by a city transit system that refused to accept paid political advertisements for the card space on its vehicles. Public forum status was denied because the city was engaged in commerce and the card space was a part of the business venture. One reason advanced for the city's policy was that the revenue earned from long-term commercial advertisements might be jeopardized by allowing the display of short-term political placards. The prohibition also minimized the risk of imposing on the captive audience of passengers. *Id.* at 303–04, 94 S.Ct. at 2716–2717.

In *U.S. Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. at 128–29, 101 S.Ct. at 2684–2685, the Court upheld a federal statute that prohibits placing unstamped material in a mailbox. In rejecting the assertion that a letterbox is a public forum of even a limited nature, the Court observed that the purpose of the statute is to protect postal revenue, while at the same time facilitating the secure and efficient delivery of the mails.[2]

---

**2.** One commentator has criticized the public forum doctrine for its "all or nothing" reasoning. Karst, "Public Enterprise and the Public Forum: A Comment on *Southeastern Promo-*

*tions, Ltd. v. Conrad,"* 37 Ohio State L.J. 247, 251 (1976). However, we do not believe the Supreme Court's opinions should be read as endorsing a mechanical analysis. Although the

The Meadowlands complex does not fit any of the accepted descriptions of a public forum. The race track and the stadium are not traditional sites like streets and parks which are stamped with "a kind of First-Amendment easement." H. Kalven, "The Concept of the Public Forum: *Cox v. Louisiana*," 1965 Supreme Court Review 1, 13. Nor does the complex resemble theatres and auditoriums which are "created for the primary purpose of public communication . . . and . . . as a place for the exchange of views. . . ." L. Tribe, American Constitutional Law 689–90 (1978).

Instead, the Meadowlands is a commercial venture by the state. It is designed to bring economic benefits to northern New Jersey, and is expected to generate at least enough revenue to meet its current expenses and debt service. It earns money by attracting and entertaining spectators with athletic events and horse races. The complex is not intended to be a public forum, and it is not unreasonable for the Authority to prohibit outside groups from engaging in activities which are counterproductive to its objectives.[3]

■ Although the sports complex is not a public forum, it is owned and operated by the state. The government's obligation to observe the Constitution does not cease when it is acting in a proprietary capacity. G. Stone, "Fora Americana: Speech in Public Places," 1974 Supreme Court Review 233, 276. We must therefore determine whether the Authority's policy is reasonable.

■ Even in a public forum, an important factor in determining the reasonableness of a restriction on First Amendment rights is whether the proposed activity is basically incompatible with the normal character and function of the place. *Hef-*

*fron v. ISKCON, Inc.,* 452 U.S. at 650–51, 101 S.Ct. at 2565–2566; *Grayned v. City of Rockford,* 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–2303, 33 L.Ed.2d 222 (1972). For example, since two parades cannot march on the same street at the same time, a governing body may allow only one. *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). It can prohibit them altogether in the tunnels on the Pennsylvania Turnpike. A city may also ban sound trucks from broadcasting loud and raucous noises on the streets. *Kovacs v. Cooper,* 336 U.S. 77, 85, 69 S.Ct. 448, 452, 93 L.Ed. 513 (1949).

■ Generally, the need to maintain public order justifies greater restrictions on active conduct such as picketing than on speech. *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). Thus, a mass demonstration in the middle of Times Square during rush hour may be prohibited. *Id.* at 554, 85 S.Ct. at 464. But students may wear arm bands in passive opposition to a war as long as they do not disrupt the high school classroom. *Tinker v. Des Moines Independent Community School District,* 393 U.S. at 512–13, 89 S.Ct. at 739–740. Similarly, civil rights protesters may keep a silent vigil in a segregated library, although they may not deliver a speech in the reading room. *Brown v. Louisiana,* 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966).

As we noted earlier, the Authority's ban is limited to solicitation of money and distribution of literature. ISKCON proposes to intercept spectators and request donations from them. This would compete with the Authority for its patrons' money and disrupt the normal activities of the complex. Moreover, ISKCON's planned conduct differs significantly from the commercial solicitation permitted at the complex.

Court has had no difficulty in categorizing some places as public forums and others as not, it has also recognized that there may be "limited" public forums. It would seem, therefore, that the level of scrutiny which a court must give to a restriction on First Amendment activity lies somewhere along a sliding scale. In this respect, public forum analysis has some resemblance to the judicial inquiry undertaken in equal protection challenges.

**3.** Even if the Authority did not operate the Meadowlands as a business enterprise, the sports complex still would not qualify as a public forum. Race tracks and stadiums are the kind of public places described by Professor

Kalven as being "so clearly dedicated to recreational use that talk of their use as a public forum would in general be totally unpersuasive." 1965 Supreme Court Review at 12. Thus, we do not have before us the issue which might arise were the stadium used by the government for civic meetings.

We also note that ISKCON does not wish to distribute literature without simultaneously soliciting money. Were that issue presented, the question would be whether a total ban is reasonable, taking into consideration the fact that all organizations may claim the same right. *See Heffron v. ISKCON, Inc.,* 452 U.S. at 654, 101 S.Ct. at 2567.

Concessionaires at the race track and stadium are licensed to sell food, beverages, souvenirs, programs and racing forms to the spectators. That service makes the patrons' stay more enjoyable, and benefits the Authority since it receives a part of the money. But contributions to ISKCON or any other outside group do not aid the Authority. On the contrary, they reduce its income to the extent that the soliciting organization receives funds that might otherwise be spent at the concessionaire stands and betting windows.

Solicitation may have other adverse effects on the Authority's business. Spectators are there for the races and athletic events. They pay for that privilege through parking charges, admission fees, and unsuccessful wagers at the track.[4] Being importuned for donations is not what a patron bargained for, and it does not tend to make his visit to the sport complex more pleasurable. The Authority fears that solicitation may offend or annoy some bettors so much that they will choose in the future to attend one of the competing, privately-owned race tracks in the area where ISKCON does not pursue its activities.

The ban on solicitation is also a legitimate means for protecting the patrons from unwanted intrusions. Like the passengers on public transportation in *Lehman v. Shaker Heights,* the Meadowlands fans are a captive audience who "may well be unable to escape an unwanted message." *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. at 542, 100 S.Ct. at 2335. At the race track, for example, patrons have only a short interval before a race begins to ascertain the final odds and reach a betting window. Yet it is on these especially inappropriate occasions, when time is short and money is in hand, that ISKCON proposes to stop people and ask for contributions.[5]

Finally, the Authority's policy plays an important role in maintaining traffic and crowd control. Bringing 75,000–85,000 people into the stadium for a game and dispersing them quickly afterwards is no mean feat. It is essential that people move rapidly and with a minimum of interruptions as they stream through the parking lot and stadium. Stopping patrons to solicit contributions, accept money, make change, and distribute literature would impede that necessary free movement.

In *Heffron v. ISKCON, Inc.,* the Supreme Court recognized that the interest in maintaining crowd control at a state fair, which it termed a "limited public forum," justified a regulation confining ISKCON's solicitation efforts to a fixed booth on the fairgrounds. 452 U.S. at 654–55, 101 S.Ct. at 2567–2568. That interest is intensified in this case, since the patrons go to the race track, not for a leisurely day's stroll through an outdoor exhibition area, but for scheduled events held inside "snug" facilities.

All of these factors support the district court's finding that the Authority's policy is reasonable and abridges no constitutional right. As a distinguished champion of the First Amendment observed:

> When self-governing men demand freedom of speech they are not saying that every individual has an inalienable right to speak whenever, wherever, however he chooses.... Anyone who would ... irresponsibly interrupt the activities of a lecture, a hospital, a concert hall, a church, a machine shop, a classroom, a football field, or a home, does not thereby exhibit his freedom. Rather, he shows himself to be a boor, a public nuisance, who must be abated, by force if necessary."

A. Meiklejohn, Political Freedom 25 (1965). *See also Kovacs v. Cooper,* 336 U.S. at 86, 69 S.Ct. at 453.

The Meadowlands complex is not a public forum, and the Authority's policy is reasonable as well as content-neutral. Therefore, we need not decide whether the ban on solicitation would also qualify as a "time, place and manner" restriction. *U.S.*

---

4. In denying the motion for a preliminary injunction, Judge Meanor said, "People go to racetracks for one thing, to lose money."

5. *Southeastern Promotions, Ltd. v. Conrad* is clearly distinguishable from this case. There, the Supreme Court held that the directors of a municipal theatre engaged in an unlawful prior restraint when they refused to rent the facility to a promoter who wished to stage a controversial musical production. The court characterized the facility as a public forum, and observed that the promoter was not seeking to use it for a competing use. 420 U.S. at 555, 95 S.Ct. at 1244. Nor was there a captive audience, because the theater-goers who purchased tickets to attend the musical production would be seeing precisely what they paid for. *Id.* at 556, 95 S.Ct. at 1245. The First Amendment would not require the theater owner and the promoter to permit an outside group to solicit patrons while the show was in progress.

*Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. at 132, 101 S.Ct. at 2687. Since we have concluded that the plaintiffs' challenge must fail, we do not meet the issue of state action on the part of the private defendants, the Giants and the Cosmos.

The judgment of the district court will be affirmed.

Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, Circuit Judges, and RE, Chief Judge.*

## SUR PETITION FOR REHEARING

The petition for rehearing filed by Appellants in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Judges ADAMS, GIBBONS, HIGGINBOTHAM, SLOVITER and BECKER would grant rehearing in banc.

Statement by Circuit Judge ADAMS sur denial of the petition for rehearing:

Although I do not necessarily disagree with the result in this case, I am troubled that the analysis employed by the panel sweeps too broadly. Changes in patterns of social organization and interaction have drastically altered the nature of places offering meaningful opportunities to speak. I am concerned that an analysis which relies too heavily on whether an area, such as a shopping center or sports complex, has traditionally been regarded as a public forum fails to come to grips with the fact that legal concepts need to evolve to reflect underlying social realities. Furthermore, I believe that courts should be circumspect in deciding that speech is incongruent with the purposes of a particular forum, especially when that forum is employed in such a broad public fashion. I am reluctant to

equate inconvenience or minor financial burdens with inconsistency. Nor do I believe that courts should decide without explicit findings, that even where the purposes of a stadium conflict with solicitation by outsiders, that there are not alternative areas within the complex, but outside the stadium itself, that might be appropriate for the distribution of ideas.

In an area as vital to political and personal freedoms as the First Amendment, the judiciary should tailor its statements restricting access as narrowly as possible in order to avoid placing unnecessary limits on speech. "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied." *Speiser v. Randall,* 357 U.S. 513, 520, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460 (1958) (citations omitted).

Circuit Judges SLOVITER and BECKER join in this statement.