MARILYN MANSON, INC.,
et al., Plaintiffs,

v.

NEW JERSEY SPORTS & EXPOSITION
AUTHORITY, Defendant.

Civil Action No. 97–2229.

United States District Court,
D. New Jersey.

May 7, 1997.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, N.Y., for Plaintiff Marilyn Manson, Inc.

Baker & McKenzie, New York City, for Plaintiffs Ardee Festivals N.J., Inc. and Delsener/Slater Enterprises, Ltd.

Pinto, Rodgers & Kopf by Robert E. Bartkus, Morristown, NJ, for all Plaintiffs.

Courter, Kobert, Laufer & Cohen by Lawrence P. Cohen, Joel A. Kobet, Michael, S. Selvaggi, Christine H. Steinberg, James H. Lockwood, Hackettstown, NJ, for Defendant.

## OPINION

WOLIN, District Judge.

Currently before the Court is an application to enjoin the New Jersey Sports Exposition Authority ("NJSEA") from preventing the "OzzFest '97" concert, which includes performer "Marilyn Manson," from being held on June 15, 1997 at Giants Stadium. Marilyn Manson is a heavy metal band that the NJSEA has deemed objectionable. Marilyn Manson's right of passage to perform at Giants Stadium is now impeded by roadblocks created by the collision between well established constitutional and contractual principles.

This Court ordered on April 29, 1997 that the NJSEA appear on May 6, 1997, to show cause why the NJSEA should not be preliminarily and thereafter permanently enjoined and restrained from: (1) prohibiting plaintiffs Marilyn Manson, Inc., Ardee Festivals N.J., Inc. ("Ardee"), and Delsener/Slater Enterprises, Ltd. ("Delsener/Slater") from presenting the OzzFest '97 concert performance including the band Marilyn Manson at Giants Stadium on June 15, 1997; (2) prohibiting or otherwise interfering with ticket sales for OzzFest '97 to be held at Giants Stadium on June 15, 1997; and (3) taking any action to repudiate or otherwise breach its agreement to lease Giants Stadium to plaintiffs on June 15, 1997. Plaintiffs ultimately seek (1) a judgment declaring that the NJSEA has violated plaintiffs' rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the New Jersey Constitution; (2) an order permanently enjoining the NJSEA from violating plaintiffs' Federal and State constitutional rights, (3) an award of damages, costs, and attorneys' fees under 42 U.S.C. §§ 1983 and 1988, and (4) a judgment on plaintiffs' claims for anticipatory breach of contract and promissory estoppel. The Court has considered the written submissions of the parties[1] and the oral arguments presented. For the reasons stated herein, the Court will grant plaintiffs' request for a preliminary injunction.

## BACKGROUND

The parties here dispute whether the plaintiffs have a right, through the Constitution or through contract, to perform their previously scheduled June 15, 1997 OzzFest '97 concert event at Giants Stadium. The Giants Stadium performance of OzzFest '97 would include a performance by the rock band Marilyn Manson.

OzzFest '97 is a "rock-music and lifestyle festival" that will tour twenty-one cities over five weeks in late May and June 1997. The tour is to begin on May 24, 1997 in Washington, D.C. and to conclude on June 29, 1997 in San Bernardino, California. The tour encompasses approximately one dozen bands and many vendors. Marilyn Manson is scheduled to perform at many of the OzzFest '97 tour stops, including Giants Stadium.

Plaintiff Marilyn Manson sells record albums nationally. Its sales statistics rank high on the Billboard charts. Indeed, in its January 23, 1997 issue, Rolling Stone Magazine named Marilyn Manson the best new artist. The band also has performed nationally on Music Television ("MTV"). Currently engaged in a live national concert tour, Mari-

---

1. The Court has considered documents from plaintiffs including: Plaintiffs' Memorandum of Law ("Pls.Mem."), the Certification of Robert E. Bartkus ("Bartkus Cert."), the Declaration of Mitch Slater ("Slater Decl."), the Declaration of Alex Kochan ("Kochan Decl."), the Declaration of Rob Light ("Light Decl."), the Declaration of Brian Warner ("Warner Decl."), Plaintiffs' Reply Memorandum of Law ("Pls.Repl.Mem."), and the Declaration of Donna DiBenedetto ("DiBenedetto Decl."). The Court has considered submissions from the defendant NJSEA including: Defendant's Memorandum of Law ("Def.Mem."), the Affidavit of Robert E. Mulcahy, III ("Mulcahy Aff."), the Affidavit of Robert Castronovo ("Castronovo Aff."), and the Affidavit of Lawrence P. Cohen, Esq. ("Cohen Aff.").

lyn Manson has performed without illegal incident on, the part of the band members.

Mitch Slater is the President of Ardee and Co–President and Co–Chief Executive Officer of Delsener/Slater. Howard J. Tytel is the Executive Vice President and General Counsel for S–F–X Broadcasting, Inc. (The parent company of Delsener/Slater and Ardee).

The Giants Stadium is a public outdoor facility located in the Meadowlands Sports Complex, East Rutherford, New Jersey. Giants Stadium has a seating capacity of 77,-716. Robert Castronovo is the Executive Vice President and General Manger of Giants Stadium. (Castronovo Aff. ¶ 1). In consultation with Robert E. Mulcahy III, President and Chief Executive Officer of the NJSEA, and with the NJSEA Commissioners, Castronovo negotiates the events to be held at Giants Stadium.

In late January or early February of 1997, PACE Touring Inc. ("PACE"), the national producer of OzzFest '97, and Creative Artists Agency ("CAA"), as agent for PACE, began discussions with the NJSEA regarding the use of Giants Stadium as a venue for OzzFest '97 in June of 1997. PACE and CAA chose Delsener/Slater to promote the event.

Slater contacted Castronovo to discuss the staging of OzzFest in June of 1997 at Giants Stadium. (Castronovo Aff. 9.) Castronovo discussed the request with Mulcahy, who initially rejected holding the concert at Giants Stadium "because of what he perceived to be safety problems, and because we did not know what acts would be appearing at the concert with Ozzy Osbourne." (Castronovo Aff. ¶ 9.) Castronovo asserts that the promoters, after several conversations with Mulcahy, convinced Mulcahy to approve the concert.

Castronovo and Mulcahy recount that the promoters had agreed to a condition that would allow the NJSEA to remove any acts that it deemed not to be in the best interests of the NJSEA. (Castronovo ¶ 9; Mulcahy Aff. ¶ 4.) Plaintiffs allow that on March 14, 1997, Robert Light, a talent agent employed by Creative Artists Agency—representing Ozzy Osbourne and Ozzfest '97, wrote to Mulcahy advising him that he and the promoters "were prepared to listen" to any conditions that the Meadowlands Complex might reasonably require.

Castronovo indicates that he had several conversations, which resulted in his sending Slater his letter of March 20, 1997, which proposed certain conditions for the OzzFest '97 performance. (Castronovo Aff. ¶ 10.) The proposed conditions included: (1) the show would be limited to six hours and end no later than 9:00 p.m., (2) the capacity would be limited to 40,000, (3) the time between sets would be extremely limited and "if possible, Pantera and Marilyn Manson should be eliminated from the bill," (4) the second stage must be kept inside the Stadium or eliminated, (5) the concourse attractions should be within the perimeter fence and none should be on the concourse, (6) the NJSEA would provide fifty State Police and Delsener/Slater would have to hire extra T–Shirt security, and (7) rent would be $175,000 plus expenses. (Slater Decl., Ex. B.)

Castronovo maintains that he requested that "if possible, [Marilyn Manson and Pantera] be removed from the concert because of what we might have perceived as problems with their performances and, in particular, reactions from fans." (Castronovo Aff. ¶ 11.) According to Castronovo, it was his "expectation that if the conditions were accepted and agreed upon, the parties would enter into the form contract incorporating the special terms and conditions of [his] March 20th letter, as has been [NJSEA] practice in the past." (*Id.* ¶ 10.)

Plaintiffs allege that Slater called Castronovo on March 20, 1997, after receiving the letter, and agreed to the terms of the letter with the specific exception of Castronovo's request that Marilyn Manson not perform. (Pls. Mem. at 4.) Plaintiffs contend that Slater informed Castronovo that Marilyn Manson was integral to OzzFest '97 and that the headlining performers Ozzy Osbourne and Black Sabbath would appear only if Marilyn Manson was permitted to perform. (*Id.*) According to plaintiffs, Castronovo agreed that Marilyn Manson would perform in the event. (*Id.*)

Slater understood from this conversation that he had reached a binding agreement with the NJSEA through his conversation with Castronovo [2] and that pursuant to industry custom and practice the agreement would be reduced to writing on or immediately prior to June 15, 1997. (Pls. Mem. at 4.) According to Castronovo, in contrast, "contracts are always signed prior to the date of performance and, on many occasions, substantially before the date of the performance, as evidence by the contract for the Iglesias concert which was signed on March 14, 1997 for a June 6, 1997 concert." (Castronovo Aff. ¶ 5.)

Castronovo recalls that after March 21, he discussed with Slater the conditions in the March 20 letter, and specifically the seating arrangements. (Id. ¶ 12.) Castronovo states that Slater told him that he would have to discuss the conditions with Light to determine which conditions were acceptable. Castronovo recalls no discussions concerning the inclusion of Marilyn Manson and Pantera in the program. (Id. ¶ 13.)

Castronovo confirms receiving on April 14, 1997 a copy of a proposed advertisement of OzzFest '97. (Id. ¶ 13 (citing Slater Decl., Ex. C).) The proposed advertisement stated that Marilyn Manson would perform at the OzzFest '97 concert and that tickets for the event would go on sale at 9:00 a.m. on Saturday, April 19, 1997. (Am.Compl.¶ 27.) Castronovo remembers receiving the advertisement and that the Marilyn Manson and Pantera bands were listed in the program. (Castronovo Aff. ¶ 13.). After Castronovo reviewed the ad and discussed some matters with a Delsener/Slater representative, Castronovo approved the advertisement. (Id. ¶¶ 13, 15.)

The approved advertisement appeared in the Village Voice and Aquarian newspapers on Wednesday, April 16, 1997 and in the Bergen Record newspaper on April 18, 1997. (Am.Compl.¶ 27.) In addition, Delsener/Sla-ter contracted for advertisements of the concert to be broadcast from April 16th to April 20th on radio stations in the New York City metropolitan area and on the national cable television network MTV. (Id.)

According to Castronovo, on April 16, 1997, after he had heard of "additional problems with the Manson band in other venues concerning protest groups and antics that are performed on stage," he reviewed these matters with Mulcahy. (Castronovo Aff. ¶ 14.) Castronovo claims that Mulcahy discussed the concert with the commissioners and on April 17, 1997 advised Castronovo to inform the promoters that the NJSEA did not want Marilyn Manson to be included in the program. (Id.) Castronovo relayed the information to Slater who objected to the removal of Marilyn Manson. (Id.)

Castronovo explains that it is not uncommon for acts to be removed from a program after advertisements or even ticket sales. (Id. ¶ 15.) According to Castronovo "[a]cts are removed for various reasons and sometimes announcements are made as late as the day of the performance." (Id.)

On April 18, 1997, the NJSEA issued a news release entitled "STATEMENT OF THE NEW JERSEY SPORTS AUTHORITY MANAGEMENT REGARDING MARILYN MANSON AND THE OZZFEST CONCERT." (Am.Compl.¶ 28.) The announcement indicated that Marilyn Manson would be prohibited from performing at Giants Stadium and canceled the OzzFest event due to the inclusion of Marilyn Manson: "the promoters have informed us that Marilyn Manson must remain in the show, therefore based upon our stated position we will not allow tickets to go on sale tomorrow." (Id.)

On April 23, the NJSEA offered to Ardee a contract containing the specific limitations contained in Castronovo's letter of March 20, 1997. The contract was "a standard form contract which is used by the Authority to book events within its facilities." [3] (Castro-

2. Castronovo indicates that he has "no recollection" of having discussions on either March 20 or March 21, 1997 with either Slater or Light concerning whether Marilyn Manson band or Pantera would perform at OzzFest '97. (Castronovo Aff. ¶ 11.)

3. At oral argument Lawrence P. Cohen, Esq. indicated on behalf of the NJSEA that over the past nine years "all concert-type performances have signed this contract or very similar contracts with this clause in it." May 6, 1997 Tr. at 6.

novo Aff. ¶ 7.) The contract included a clause affording the NJSEA the opportunity to omit any performer from the bill under certain circumstances:

### 8. *Performance Approval*

LICENSOR retains approval right of performance, exhibition, or entertainment to be offered under this Agreement and LICENSEE agrees that no such activity or part thereof shall be given or held if LICENSOR files written objection on the grounds of character offensive to public morals, failure to uphold event advertising claims or violation of event content restrictions agreed to by both parties at the time of completion of this agreement.

(Slater Decl., Ex. E, ¶ 8.) The contract also specifically excluded both Marilyn Manson and Pantera. (*Id.* ¶ 7.)

According to Castronovo, Paragraph 8, which refers to the right of the NJSEA to approve the activity or part thereof, has been a standard clause in the NJSEA contract for a "substantial period of time" and has been included in contracts previously signed by Ardee and Delsener/Slater for events that they have staged at the NJSEA.[4] (Castronovo Aff. ¶ 7)

On April 24, 1997, Tytel rejected the April 23 proposed License Agreement by letter. In this letter, Tytel dismissed the proposed conditions of the March 20, 1997 Castronovo letter as ambiguous and superseded by subsequent discussion. Tytel denounced "the sudden reappearance of an objection to Pantera in [the] letter" as a "transparent attempt to rehabilitate the March 20th letter which had, in all respects, been disregarded by both parties."

## DISCUSSION

### I. Standard for Granting a Preliminary Injunction

The plaintiffs seek injunctive relief under Federal Rule of Civil Procedure 65(a) and (b), prohibiting the NJSEA from barring Marilyn Manson and OzzFest '97 from performing at Giants Stadium on June 15, 1997.

Injunctive relief is an "extraordinary remedy," that should be granted only in limited circumstances. *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994), *cert. denied*, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). In assessing whether a preliminary injunction is warranted, the Court must consider: (1) the likelihood that the plaintiff will prevail on the merits; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See, e.g., Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir.1994); *Opticians Ass'n v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir.1990). If plaintiffs fail to establish these elements, the Court must deny the request for a preliminary injunction. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989). In this case, the plaintiffs have established their entitlement to a preliminary injunction under this standard.

### II. Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

The first element that this Court must consider in assessing whether a preliminary injunction is warranted is whether the plaintiffs likely will succeed on the merits. Crucially, the moving party need not demonstrate that it will undoubtedly win after a trial on the merits; to establish a *prima facie* case the moving party need only show a reasonable probability of prevailing on the merits:

It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits.

*Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975) (citations omitted); *see also SK&F, Co.*

---

4. In some instances, the NJSEA has exercised its discretion under paragraph 8, while in other instances, the NJSEA has disapproved of certain acts prior to execution of a contract. (Castronovo Aff. ¶ 8.)

*v. Premo Pharmaceutical Laboratories Inc.*, 625 F.2d 1055, 1066 (3d Cir.1980). For the reasons discussed below, the Court finds that the plaintiffs have established a likelihood of success on the merits under various theories.[5]

### A. The Violation of Plaintiffs' First Amendment Rights

▪ Plaintiffs argue that the NJSEA's prohibition of Marilyn Manson from performing at Giants Stadium is an illegal "prior restraint" and content based restriction on plaintiffs' First Amendment Rights.[6] To determine whether the NJSEA has acted in violation of the First Amendment to the United States Constitution, the Court must first examine the type of fora that exist under the pertinent constitutional jurisprudence and the constitutional requisites of these fora.[7]

▪ The extent to which the government may limit activity protected by the First Amendment depends on the locale where the speech or conduct takes place. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *International Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155, 159 (3d Cir.1982) ("*Krishna v. NJSEA*"). A government owned facility may be catego-

rized as one of three types of fora: a traditional public forum, a designated or limited public forum, or a non-public forum. *See, e.g., Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). The primary factor in determining which category a given forum falls within is the manner in which the locale is used. *See Krishna v. NJSEA*, 691 F.2d at 160.

▪ A "traditional public forum" is designated as such because it is a forum that has historically been used for public assembly, for discussion of public questions, and for communication of thoughts between citizens. *See Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1370 (3d Cir.), *cert. denied*, 498 U.S. 899, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990). A traditional public forum is a place that has as "a principle purpose the free exchange of ideas." *International Soc'y of Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680, 112 S.Ct. 2701, 2707, 120 L.Ed.2d 541 (1992) ("*Krishna v. Lee*") (citations and internal quotations omitted). Streets, parks, municipal auditoriums and theaters are quintessential traditional public forums. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244–45, 43 L.Ed.2d 448 (1975).

---

5. Plaintiffs allege both constitutional and contractual theories of recovery. The Court, of course, should avoid deciding constitutional questions where other grounds are available to decide a case. In this case, the Court addresses the constitutional issues in addition to the contractual issues because although plaintiffs have shown a reasonable probability of success on the merits under a contractual theory, plaintiffs' chances of recovering under a constitutional theory are possibly greater; thus, an analysis of both theories is necessary to assess plaintiffs' entitlement to a preliminary injunction. Moreover, because the constitutional and contractual issues in this case are so intertwined, these issues should be analyzed together.

6. The NJSEA has argued that plaintiffs have waived their First Amendment rights through entering into a licensing agreement with the NJSEA. The Court addresses that argument below.

7. Music and entertainment are undoubtedly protected speech for purposes of the First Amendment. *See, e.g., Ward v. Rock Against Racism*,

491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment"); *Tacynec v. City of Philadelphia*, 687 F.2d 793, 796 (3d Cir.1982) ("[T]he Supreme Court has made it clear that entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment Guarantee.") (citations and internal quotations omitted).

Additionally, the NJSEA is a state actor for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983. *See International Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155, 159 (3d Cir. 1982) ("We accept at the outset that the Authority, being an instrumentality of the State of New Jersey, furnishes the necessary state action for a 1983 suit and that the First Amendment protects the plaintiffs' solicitation efforts.").

A given parcel of government property will not be considered a true public forum "where the full exercise of First Amendment rights would be inconsistent with the special interests of a government in overseeing the use of its property." *Krishna v. NJSEA*, 691 F.2d at 160 (citations and internal quotations omitted). Nor is a public forum created merely because members of the public are permitted freely to visit a place owned or operated by the government. *See Krishna v. Lee*, 505 U.S. at 680, 112 S.Ct. at 2706. The decision to create a public forum must be made by "intentionally opening a nontraditional forum for public discourse." *Id.*

First Amendment activity in a public forum may be restricted by reasonable time, place, or manner regulations if the regulations "are justified without reference to the content of the regulated speech, [ ] are narrowly tailored to serve a significant interest, and [ ] leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753 (citations and internal quotations omitted); *see also Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989); *Gregoire*, 907 F.2d at 1370.

A "designated" public forum is created where the government intentionally opens public property that is not a traditional public forum for use by the public as a place for expressive activity. *See, e.g., Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955–56. A designated public forum may be either of a limited or unlimited character. *See Krishna v. Lee*, 505 U.S. at 678, 112 S.Ct. at 2705. Although the state is not required to maintain the open status of the forum indefinitely, while the facility is open to the public, strict scrutiny analysis applies to any content-based regulation of protected speech. *See id; see also Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 ("[W]hen the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest"). The Courts have recognized the creation of a designated public forum in disparate contexts. *See, e.g., Wid-*

*mar v. Vincent*, 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981) (state university meeting facilities; *Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 174 n. 6, 97 S.Ct. 421, 426 n. 6, 50 L.Ed.2d 376 (1976)) (school board meetings); *Southeastern Promotions, Ltd.*, 420 U.S. at 555, 95 S.Ct. at 1244–45 (municipal auditorium and city leased theater); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985) (municipal amphitheater).

A "non-public" forum is a publicly owned facility that "is not by tradition or designation a forum for public communication...." *See Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955. The state may restrict speech in a non-public forum as long as the distinctions drawn "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. A First Amendment violation occurs when the government "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includable subject." *Id.* The government may prohibit all forms of communication as long as the ban is reasonable and content-neutral. *See United States Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981). "The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *See Krishna v. Lee*, 505 U.S. at 678, 112 S.Ct. at 2705.

1. **Plaintiffs Have Established a Likelihood of Success on the Merits Even if Giants Stadium Is a Non–Public Forum and the Lowest Level of Scrutiny Were to Apply**

The plaintiffs urge the Court to find that Giants Stadium is a public forum. The NJSEA argues that the Giants Stadium is a non-public forum, citing *International Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority*, 691 F.2d 155 (3d Cir.1982). The Court finds that

at this stage it need not decide what type of forum Giants Stadium is because plaintiffs have sufficiently established a likelihood of success on the merits even under the standards applicable to a non-public forum.

In a non-public forum, as discussed above, the government may distinguish between speakers as long as the distinctions drawn are reasonable in Light of the purpose served by the forum and are viewpoint neutral. *See Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. The government cannot deny access to a speaker solely to suppress the point of view he espouses on an otherwise includable subject. *See id.; Krishna v. Lee,* 505 U.S. at 678, 112 S.Ct. at 2705.

In this case, there is a substantial likelihood that plaintiffs will establish either that NJSEA's restrictions on the ability of Marilyn Manson to perform are unreasonable or content based. The NJSEA has indicated that it excluded Marilyn Manson from the concert because of the band's "antics." According to the NJSEA, these anticipated "antics" may have created security risks and may have tarnished the NJSEA's reputation and ability to remain a lucrative forum for concert events.

■ Thus, this does not appear to be a case when the government denies access to a forum because of the identity of the speaker; the NJSEA has not endeavored to make that claim. Nor does this appear to be a case in which the government denies access of an individual to a forum because of a subject matter limitation; indeed, the NJSEA would allow the remaining bands in the show and all of these bands are of the same musical genre—heavy metal. Rather, it appears that the NJSEA would deny Marilyn Manson access to Giants Stadium because of anticipated antics, *i.e.,* because of the anticipated content of Marilyn Manson's performance. The NJSEA's motivation, thus, appears to be content based rather than viewpoint neutral.

The clause on which the NJSEA relies for its authority to exclude Marilyn Manson from the show confirms the motivation of the NJSEA. Under the NJSEA's proposed contract, it may exclude a performer for: "grounds of character offensive to public morals, failure to uphold event advertising claims or violation of event content restrictions agreed to by both parties at the time of completion of this agreement." The only aspect of this clause that the NJSEA relies upon is that Marilyn Manson's performance is anticipated to be "offensive to public morals." This appears to be the quintessential essence of content based regulation.

The NJSEA has argued that safety concerns prompted its refusal to allow Marilyn Manson to play at Giants Stadium. But the NJSEA has put forth no evidence that its proffered safety concerns are legitimate rather than pretextual. To the contrary, no unlawful or violent activity has occurred on Marilyn Manson's current tour. And it appears that the plaintiffs have complied with NJSEA's requests for concessions intended to bolster security. Plaintiffs, for example, agreed to provide additional security and to address other safety measures. Thus, the proffered security concerns have been addressed and are no longer an impediment to the performance. *See* Castronovo Letter, March 20, 1997.

The NJSEA also argued that the inclusion of Marilyn Manson would tarnish NJSEA's reputation and ability to earn revenue. But, the NJSEA conceded at oral argument that the decision to exclude Marilyn Manson was not based on the economics of the show in question; the show was anticipated to earn substantial revenue. Rather, NJSEA argued that the inclusion of Marilyn Manson would somehow affect NJSEA's future ability to use the stadium. The NJSEA's argument is insufficiently concrete to be persuasive and there are no written guidelines defining what might endanger NJSEA's reputation. Consequently, the Court is not persuaded.

Additionally, it appears that the NJSEA's requirement that all performers sign a contract allowing the NJSEA to regulate the morality of concert programs may be an unreasonable restriction on access to even a non-public forum. Plaintiffs argue that the NJSEA's authority to reject any performer based on inadequately defined guidelines is an unconstitutional prior restraint on speech. The Court finds that there is a substantial likelihood that plaintiffs will prevail on this

claim. Although the NJSEA may require that performers satisfy reasonable requirements in order to perform at Giants Stadium, it is not clear that all of the conditions that Giants Stadium imposes are reasonable—especially insofar as a required agreement that allows the NJSEA unfettered discretion in rejecting the content of a proposed performance on the basis of its morality. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Gannett Satellite Information Network, Inc. v. Berger,* 894 F.2d 61, 68–69 (1990) (to be subject to facial challenge regulation vesting agency with discretion must have close enough nexus to expression or expressive conduct to give rise to a substantial threat of undetected censorship); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189 (11th Cir.1991) (recognizing as meritorious the argument that state system of permitting the placement of news racks at interstate rest area, a non-public forum, was a facially unconstitutional prior restraint because it subjected the constitutionally protected distribution of newspapers to the "standardless, unfettered discretion of Florida state officials").

Here, when asked at oral argument, the NJSEA states that there are no written standards for the regulation of the content of concert performances. Castronovo indicates that "[t]here have been many occasions in the past where we have rejected certain types of events at the Authority because management does not believe it would be in the best interests of the Authority and sometimes because we do not believe it would be a successful commercial venture." (Castronovo Aff. ¶ 4.) Castronovo points out that, for example, the NJSEA refused to accept Howard Stern's New Year's Eve Show on the grounds that "it may have been offensive to various groups." Here, the NJSEA has maintained that it ousted Marilyn Manson because of rumored "antics" at other shows.[8]

The lack of any identifiable guidelines in restricting the content of programs appears clearly unreasonable. And the contractual provision allowing the NJSEA to reflect a performance because it does not comport with public morality appears equally problematic. Without proof of at least reasonable guidelines, the NJSEA system of choosing concert performances probably cannot pass constitutional muster.

## 2. Plaintiffs Would Likely Establish on the Merits that Giants Stadium Is a Limited Public Forum

■ Even if the plaintiffs were to fail to satisfy the burden of establishing a violation of their First Amendment rights under the non-public forum standard, plaintiffs likely could establish on a more fully developed record that Giants Stadium has become a limited public forum as a venue for artistic performances.

In *Krishna v. NJSEA,* the Third Circuit addressed the constitutionality of NJSEA's prohibition of monetary solicitations by Krishnas of patrons of the NJSEA's sporting facilities. 691 F.2d at 158. The Third Circuit found that Giants Stadium was not a traditional public forum, because the complex did not resemble theaters and auditoriums created for the primary purpose of public communication and the exchange of views. *See id.* at 161. According to the Third Circuit, the Meadowlands was a commercial venture designed to bring economic benefits to northern New Jersey through entertaining spectators with athletic events and horse races; thus, the Third Circuit found: "the complex is not intended to be a public forum, and it is not unreasonable for the Authority to prohibit outside groups from engaging in activities which are counterproductive to its objectives." *Id.*

■ But, *Krishna v. NJSEA* is readily distinguishable and not determinative of the

---

8. When the Court queried at oral argument what significance "protest groups" and "antics" had with regard to the NJSEA's decision to oust Marilyn Manson, Mr. Cohen indicated that these terms partly concerned an incident in Tennessee in which Marilyn Manson allegedly walked off stage for unknown reasons and the crowd became rowdy, (May 6, 1997 Tr. at 13), and that

these terms partly concerned rumors of the "presence of nude children [and] the torture of animals," (*Id.* at 23.) The source that Mr. Cohen cited for the rumors of nudity and animal torture reported also that the rumors proved untrue: "Managers from Manson concert venues in the lower 48 say no such activities occurred in their cities." (*Id.*)

current public status of Giants Stadium in the context of the issues now before the Court. In *Krishna v. NJSEA,* although the Third Circuit termed Giants Stadium "non-public," the Court addressed the First Amendment rights of the patrons of the NJSEA's events and not the rights of performers to whom the NJSEA has opened its facilities to entertain audiences. Whereas in *Krishna v. NJSEA,* the NJSEA clearly did not open Giants Stadium to citizens to solicit charitable contributions, in this case it is undisputed that the NJSEA has opened Giants Stadium to performers in musical events. Where the government chooses to open a forum for a particular type of communicative activity, the government has created a limited public forum to that extent, and the government's restrictions on the content of speech are subject to strict scrutiny.

Indeed, plaintiffs have put forth substantial evidence to the effect that Giants Stadium is a limited public forum requiring strict scrutiny of the government's regulations on the content of speech in the forum. Plaintiffs point out that approximately thirty-eight public concerts, totaling more than seventy shows, have been held at Giants Stadium. Indeed, the NJSEA readily admits that over thirty different concerts have been held at Giants Stadium in recent years.

The Court would unhesitatingly reject, however, plaintiffs' argument that Giants Stadium is a public forum. As the NJSEA asserted, one may not perform at Giants Stadium at will. Rather, one must sign a contract, one must pay a fee, and one must agree to certain conditions. Although the reasonableness and lawfulness of some of the conditions imposed by the NJSEA are currently at issue, there appears no doubt that the NJSEA has not opened Giants Stadium for full expression at anytime. Thus, the Court finds that plaintiffs cannot establish that Giants Stadium is a pure public forum.

The NJSEA correctly stated at oral argument that an evidentiary hearing would be required to evaluate Giants Stadium's status as a public forum; a final determination of the issue would require more detailed evidence of the use of that facility. But the Court is not now faced with a final determination. The Court need not decide the status of the facility except to establish the likelihood of plaintiffs' success on the merits were the issue to be litigated.

**B. Contract Formation and Terms**

Plaintiffs allege also that, the NJSEA entered into a binding contract with Delsener/Slater under which the NJSEA agreed to lease Giants Stadium on June 15, 1997 as a venue for OzzFest '97. The NJSEA argues that there is no contract between itself and the plaintiffs because there was no meeting of the minds. The Court finds that plaintiffs have established a likelihood of recovery under a contract theory.

A prerequisite of any contract is mutual assent or a meeting of the minds. *See Knight v. New England Mut. Life Ins.,* 220 N.J.Super. 560, 565, 533 A.2d 55 (App. Div.1987); *Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282, 287 (3d Cir. 1993). A contract need not be expressed in writing as long as the parties agreed to do something that they previously did not have an obligation to do. *See Radiological Soc'y of New Jersey v. Sheeran,* 175 N.J.Super. 367, 418 A.2d 1300 (App.Div.1980); *Comerata v. Chaumont, Inc.,* 52 N.J.Super. 299, 145 A.2d 471, 475 (App.Div.1958) ("[P]arties may orally, by informal memorandum, or by both agree upon all the essential terms of a contract and effectively bind themselves thereon, if that is their intention, even though they contemplate the execution later of a formal document to memorialize their undertaking.").

Plaintiffs allege that on March 20, 1997 Delsener/Slater and the NJSEA entered into an oral agreement under which Delsener/Slater leased Giants Stadium to OzzFest '97 including Marilyn Manson for June 15, 1997. The NJSEA disagrees.

There is no dispute that the parties had agreed on the price, the time, and other essential terms. The NJSEA argues that it did not intend to be bound until a final written contract was signed. Plaintiffs counter that they thought there was a done deal,

with a written contract to be signed as a mere memorialization.

The Court is persuaded by plaintiffs' explanation that contracts in the concert music industry are not reduced to writing until a late date. Additionally, the Court observes that the NJSEA appeared to express continued assent to OzzFest '97 and Marilyn Manson playing at Giants Stadium on June 15, 1997 when the NJSEA approved an advertisement displaying all of the relevant details about the concert including Marilyn Manson's performance. Thus, notwithstanding the NJSEA's apparent policy of not becoming bound until a formal contract is signed, plaintiffs have a reasonable likelihood of success on the merits. Moreover, were a jury to find that no contract was formed, plaintiffs would have a reasonable likelihood of success on a promissory estoppel theory.

### C. Waiver

NJSEA argues that even if plaintiffs had a constitutional right to perform at Giants Stadium they waived that right. According to the NJSEA, plaintiffs knew that any contract with the NJSEA would allow the NJSEA the authority to oust any band in its discretion. Thus, according to the NJSEA, if there was a contract, which is a prerequisite to performing at Giants Stadium, then plaintiffs waived their right to have Marilyn Manson perform. The Court rejects the argument.

The question of waiver of a federally guaranteed constitutional right is a federal question controlled by federal law. *See Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1094 (3d Cir.1988). Although constitutional rights may be waived under certain circumstances it is well settled that a waiver of a constitutional right "must be voluntary, knowing, and intelligent." *See id.* The Court must indulge in every reasonable presumption against waiver of fundamental constitutional rights. *See id.* at 1094–95.

In this case, the NJSEA likely cannot demonstrate that plaintiffs voluntarily relinquished their First Amendment rights. Plaintiffs appear to have signed no documents releasing their rights. Additionally, there appears to be no sign of acquiescence to the NJSEA's suggestion that Marilyn Manson not perform. Rather, plaintiffs have consistently insisted that Marilyn Manson be part of the OzzFest '97. Despite the NJSEA's protestations that it never agreed to allow Marilyn Manson to play, NJSEA acquiesced to the performance—they approved advertising indicating that Marilyn Manson would play at Giants Stadium. The NJSEA argues that it often removes performers from the program even after advertisements have been published and tickets have been sold. Notwithstanding these practices, the Court finds that the NJSEA has put forth insufficient proof to establish the waiver issue.

Additionally, the NJSEA's ability to assert a waiver theory is constrained by New Jersey contract law, which implies a covenant of good faith and fair dealing in every contract. *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575, 587 (1997). Under this covenant, neither party may do anything to destroy or injure the right of the other party to receive the fruits of the contract that binds them. *See id.* The covenant of good faith exists even in contracts that contain express and unambiguous provisions permitting either party to terminate without cause. *See id.* Thus, in this case, even if it is established that there is a binding contract that permits the NJSEA to oust any band on the bill for moral reasons, Marilyn Manson may establish that the NJSEA cannot exercise this provision in compliance with good faith and fair dealing.

Moreover, even if the plaintiffs were found to have acquiesced, there is doubt as to whether such acquiescence would be voluntary under the present facts. The NJSEA apparently conditions access to Giants Stadium or the signing of a contract that affords the NJSEA virtually unfettered discretion to censor the show. If a performer must sign the contract to perform at a forum—in which the performer has a right to perform subject only to reasonable restrictions—the signing of the contract may not be a voluntary relinquishment of all of the constitutional rights associated with that performance.

## III. Plaintiffs Have Demonstrated that They Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Granted

 Plaintiffs contend that if the injunctive relief is not granted, plaintiffs will have missed their only opportunity for "exposure to the national media and music industry representatives headquartered in New York City." (Am.Compl.¶ 30.) Delsener/Slater charges that if the NJSEA is permitted to repudiate its agreement with Delsener/Slater, "NJSEA will have injured Delsener/Slater's business and reputation in the concert industry as a promoter that can be relied upon to provide a suitable New York area venue." (Am.Compl.¶ 31.) Additionally, plaintiffs argue that a refusal to allow them to perform would be a deprivation of their First Amendment rights.

The NJSEA claims that there will be no irreparable harm for several reasons, including: (1) plaintiffs have no right to play at Giants Stadium because they did not sign a contract, (2) plaintiffs have waived their First Amendment rights, (3) plaintiffs' interest in the concert is merely financial, (4) Marilyn Manson could perform at other venues, and(5) OzzFest '97 could be held at another forum.

The Court disagrees with the NJSEA. The plaintiffs' potential First Amendment deprivation is undoubtedly an irreparable injury. And the plaintiffs will suffer other irreparable injuries, as well, including loss to reputation in the case of the promoters, and reduced public exposure in the case of the artists. Thus, the plaintiffs have established the prospect of irreparable injury sufficient to meet the requirement for a preliminary injunction.

## IV. Allowing Marilyn Manson to Play at Giants Stadium Will Not Cause the NJSEA Irreparable Harm

 According to the NJSEA, its goal is to advance the general welfare, health, and prosperity of the people of New Jersey by staging athletic contests, horse racing and other expositions, see N.J. Stat. Ann. § 5:20–2; the NJSEA will be unable to achieve that goal if the NJSEA is forced to "allow access to its facilities by individuals who are not otherwise contractually entitled to it." (Def. Mem. at 22.) The NJSEA argues that by forcing it to permit Marilyn Manson to perform, the Court would erode the NJSEA's statutory authority to determine who may have access to its facilities. This alleged erosion of its power, according to the NJSEA, is the irreparable injury.

The Court again disagrees with the NJSEA. Of course, the NJSEA must have discretion to choose events fitting with its mandate under statute to earn revenue and entertain the public. And the NJSEA can impose reasonable restrictions comporting with its mandate. But the contract at issue here, with the clause permitting moral censorship of any performance, does not appear reasonably calculated to fulfill the NJSEA's statutory responsibilities. Consequently, the NJSEA appears to have no legitimate state interest in enforcing the restrictive content clause of the contract.

Moreover, on the facts of this case, it appears patently unreasonable that Giants Stadium would permit an entire concert of heavy metal bands, while excluding only one—Marilyn Manson—which has demonstrated no propensity for illegal activities on stage.

Thus, the NJSEA will suffer no irreparable injury from allowing Marilyn Manson to perform at Giants Stadium. The Court will require plaintiffs to post a bond in the amount of $500,000 to cover any damage that might be caused by the preliminary injunction.

## V. The Public Interest Will Best Be Served Through Granting Plaintiffs' Requested Injunctive Relief

 The NJSEA argues that the public interest will suffer if the preliminary injunction is granted because the NJSEA will no longer be able to act in a manner that will guarantee that the public interest will be promoted. The NJSEA has demonstrated no concrete need (in keeping with its public mandate) to exclude Marilyn Manson while allowing the other heavy metal bands to perform. And the NJSEA has indicated that

the show will likely be a profitable economic endeavor, a strong indicator that a substantial number of community citizens would like to attend Marilyn Manson's performance. For these reasons, the Court finds that to promote the free expression of ideas, uncensored by a state actor who exercises unfettered discretion, warrants the grant of this preliminary injunction.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion for a preliminary injunction will be granted.